```
 1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION

 3                CASE NUMBER 17-20712-CR-MORENO

 4
      UNITED STATES OF AMERICA,
 5
                     Plaintiff,              Courtroom 13-3
 6
         vs.                                 Miami, Florida
 7
      JAMES M. SCHNEIDER,                     June 11, 2018
 8
                     Defendant.
 9
      =====================================================
10           PROCEEDINGS ON MOTION TO DISQUALIFY COUNSEL
            BEFORE THE HONORABLE FEDERICO A. MORENO
11                UNITED STATES DISTRICT JUDGE

12    =====================================================
      APPEARANCES:
13
      FOR THE GOVERNMENT:     CHRISTOPHER B. BROWNE, AUSA
14                            JERROB DUFFY, AUSA
                              United States Attorney's Office
15                            99 Northeast Fourth Street
                              Miami, Florida 33132
16                                              305-961-9419
                                           Fax: 305-530-7976
17
18    FOR THE DEFENDANT:      DANIEL L. RASHBAUM, ESQ.
                              ALLISON M. GREEN, ESQ.
19                            Marcus Neiman & Rashbaum, LLP
                              2 South Biscayne Boulevard
20                            Suite 1750
                              Miami, Florida 33131
21                                              305-400-4260
                                           Fax: 866-780-8355
22

23

24

25
```

```
 1  ALSO PRESENT FORMERLY
    FOR SHELDON ROSE:        JEFFREY A. NEIMAN, ESQ.
 2                           MICHAEL PINEIRO, ESQ.
                             Marcus A. Neiman & Rashbaum, LLP
 3                           2 South Biscayne Boulevard
                             Suite 1750
 4                           Miami, Florida 33131
                                                 305-400-4260
 5                                          Fax: 866-780-8355

 6  REPORTED BY:             GILDA PASTOR-HERNANDEZ, RPR, FPR
                             Official United States Court Reporter
 7                           Wilkie D. Ferguson Jr. US Courthouse
                             400 North Miami Avenue - Suite 13-3
 8                           Miami, Florida  33128    305.523.5118
                             gphofficialreporter@gmail.com
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                      **TABLE OF CONTENTS**

2                                                          Page

3

4
  Reporter's Certificate ..................................... 86

5

6

7

8

9
                          **EXHIBITS**

10
  Exhibits                    Marked for           Received
11                            Identification        in Evidence

12  Description               Page     Line        Page     Line

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          (The following proceedings were held at 10:55 a.m.:)

 2          THE COURT:  Good morning.  Let's call United States of

 3  America versus James Schneider, Case Number 17-20712-Criminal.

 4  On behalf of the Government.

 5          MR. BROWNE:  Good morning, Your Honor.  Christopher

 6  Browne and Jerrob Duffy on behalf of the United States.

 7          THE COURT:  Okay.  On behalf of the defendant.

 8          MR. RASHBAUM:  Good morning, Your Honor.  Dan Rashbaum

 9  and Allison Green on behalf of James Schneider who's present.

10          THE COURT:  Who else do we have?

11          MR. NEIMAN:  Good morning, Your Honor.  Jeffrey Neiman

12  and Mr. Michael Pineiro on behalf of -- I'm not exactly sure who

13  but formerly Sheldon Rose.

14          THE COURT:  Well, that's what I want to know.  You guys

15  are far away enough, right?  Is that to make a statement?

16          And the rest of the people are just observers.

17          MR. BROWNE:  Observers and specifically interns from

18  our office.

19          THE COURT:  It's an open courtroom.  Have a seat.

20          I need a lawyer for each side.  Who's going to speak

21  for the defendant?

22          MR. RASHBAUM:  For Mr. Schneider.

23          THE COURT:  That's defendant, yes.  That is the

24  defendant that I have, okay, right?  There's only one defendant.

25          MR. BROWNE:  In this case, Your Honor.
```

1         THE COURT:  That's the case I have, yes.  Right?

2         MR. BROWNE:  Yes, sir.

3         THE COURT:  Okay.  Now, Mr. Rashbaum, this is the

4   second case I have with your firm and Judge Altonaga had another

5   case.  So you know by now -- I don't think you were here with

6   Mr. Marcus -- that I'm uncomfortable when we have these possible

7   conflicts, and of course, we have to determine whether it's an

8   actual conflict, a potential conflict, a waivable conflict and

9   all of that.

10        And the prosecutor in that other case was who, Shirley?

11        THE COURTROOM DEPUTY:  Which case?

12        THE COURT:  It's a different prosecutor, right, the

13  husband and wife case?

14        You're familiar with that case because you're working

15  on that case, too?

16        MR. RASHBAUM:  Ms. Mackenzie.

17        MS. GREEN:  Ms. Mackenzie Duane, Your Honor.

18        MR. RASHBAUM:  Oh, I'm sorry.  Ms. Duane.

19        THE COURT:  Mackenzie Duane.  Ms. Duane.  Mackenzie I

20  think is her first name, but in any event, I had a strong

21  objection to the firm representing the husband and wife because

22  of all the issues that were in that case that I'm sure you're

23  familiar with, right, of what I said in the last hearing?

24        MR. RASHBAUM:  I read the notes from what you said,

25  Your Honor, yes.

1       THE COURT:  Okay.  So there is a difference with this

2  case.  One of the main differences, and I read the whole

3  transcript before Judge Louis of May 14th, is it's not a

4  codefendant.  So I'm less concerned when it's a prior client

5  whose case has been finished, because Mr. Rose, the prior

6  client, has already gotten his Rule 35 and is someplace in

7  Orlando at some halfway house or something.

8       I read the transcript and I would have to hear the

9  waiver again because there were a lot of telephone problems from

10 reading the transcript.  I've got to make sure, plus I like to

11 have a dialogue with the defendant, prior defendants to get a

12 sense of the waiver, and since we have a trial date of August,

13 that's why I brought you here today.  I was going to do it later

14 but I know there are some conflicts with scheduling, so I wanted

15 to accommodate as many people as I could and I appreciate you

16 all coming here on short notice.  So you don't have to make all

17 the arguments again that you've made before Magistrate Louis.

18      So let me start before anybody objects, because since

19 I'm going to be the trial judge, it's something I'm very

20 concerned with because of what could happen.  I'm comfortable,

21 though we'll have to ratify, that the most important thing, of

22 course, is this defendant's waiver.  I assume there won't be any

23 problem with ratifying that Mr. Schneider waives any conflict.

24 He could never complain about the possible past representation,

25 et cetera.  That would be the first thing we'd have to do.

1  We'll probably not have any problems because there's no

2  codefendant like a husband and wife cooperation.

3          Now, I'm concerned with Mr. Rose and the phone thing.

4  I don't know if everything was understood which is generally why

5  I don't like phone hearings.  So I'm going to have to meet

6  Mr. Rose and go through that in any event with him here.  I

7  think he's scheduled to depart the halfway or whatever

8  rehabilitation, when?  Look at that.

9          MR. DUFFY:  July 27.

10         THE COURT:  July 27th, but of course, that starts

11  getting close to August.

12         So what a judge never likes is for something to happen

13  at the very end, where someone right before trial, where

14  Mr. Rose would say, wait a second, I have a problem; not I'm

15  going to tell the truth no matter what and it doesn't matter to

16  me who cross-examines me, because I'm telling the truth and I

17  don't have anything to gain.  I know all of that, that you all

18  said more eloquently and you went through it, but I have to deal

19  with that.

20         Then, of course, I have to deal with any privileged

21  communications, how do we do that in a relatively small firm

22  where all these lawyers are involved.

23         So those are the concerns that I have, and you all are

24  going to have to -- obviously, it's very important for a lawyer

25  to have conflict-free counsel, a lawyer of his choice, but it's

Motion to Disqualify Counsel

1   not absolute if there are these other problems.

2        I don't have the same problems I had with the husband

3   and wife situation, because they're pending and we would have a

4   2255.  Here there's no possibility of a 2255 with Mr. Rose, and

5   you all tell me if I'm wrong in describing what has happened in

6   the past.

7        From the Government, am I wrong in any way I described

8   what has been happening so far?

9        MR. BROWNE:  There's one I think important distinction;

10  is that when Mr. Rashbaum and Ms. Green entered Notices of

11  Appearance in this case, Mr. Rose was not a prior client of the

12  firm.  The Government was told by Mr. Pineiro at the time that

13  they would continue to represent Mr. Rose in connection with his

14  testimony in the Schneider case.  He was not a prior client at

15  that time, he was a client of the firm, and that is a

16  conversation that I was present for, Mr. Duffy was present for,

17  the FBI agent was present for.

18       Interestingly, during that information, Mr. Pineiro

19  told Mr. Duffy that the MNR firm, Mr. Rashbaum's firm, would

20  have to represent Mr. Rose pro bono presumably because Mr. Rose

21  didn't have any more money to pay that firm.

22       THE COURT:  Well, let's talk.  I'm glad you mentioned

23  that, because there was another thing.  The financial thing,

24  which you've made a big deal of in front of Judge Louis, I'm not

25  as concerned with because it's clear.  You know, you have a

1  father and a son.  Even if the father is not a defendant and he

2  wants to beat up his son for committing a crime, the father pays

3  money for the son's representation.  The lawyer represents the

4  son even if the father is the one who's putting up the money,

5  unless you all think I'm wrong with that. There's nothing wrong

6  with who pays the money unless they're controlling what the

7  particular defense is.

8        If the father were say, I want him to plead guilty and

9  pay for it and the son did not want to do it, and he says, well,

10  I'm paying you, the lawyer would say, you're paying me but I'm

11  representing him.  It's as simple as that.

12        So who pays for it doesn't necessarily influence me or

13  should it?

14        MR. BROWNE:  I think it should because it's not a

15  party.

16        THE COURT:  That happens all the time.

17        MR. BROWNE:  But it's the law firm here that's really

18  making the payment.  It's the law firm that's paying a lawyer

19  that if --

20        THE COURT:  Because he's got a credit.  Didn't he

21  mention something about a credit, Mr. Rose, in the phone

22  conversation?  He said, I think I have a credit.  Didn't he say

23  that?

24        MR. RASHBAUM:  That's what was said at the hearing.

25        THE COURT:  That's what he said, not it was said.

Motion to Disqualfy Counsel

1  Someone said it.  Mr. Rose said --

2       MR. RASHBAUM:  That's what Mr. Rose said.

3       THE COURT:  -- I'm not worried about it because -- I

4  don't know how that works, maybe by the hours or something.

5  It's kind of uncomfortable.  You're not uncomfortable, huh,

6  Mr. Rashbaum?

7       MR. RASHBAUM:  No, I'm not uncomfortable at all.

8       THE COURT:  Maybe you should be though, right, because

9  it happened with Judge Altonaga.  That's an easy case, because

10  one defendant didn't waive, end of story.  Obviously, if a

11  defendant doesn't waive, we don't even get to the second part.

12       The waiver of Mr. Rose, whether in writing or over the

13  phone conversation, I need to see him and speak with him and

14  discuss with him so he understands.  Though what are the

15  consequences?  See, there's nothing -- he does have a privileged

16  communication, but other than that, there's no proceeding,

17  right?  He's not going to be charged with anything, right?

18       MR. BROWNE:  He's going to take the stand under oath,

19  and he's going to be subject to cross-examination.

20       THE COURT:  Everybody who takes the stand does it under

21  oath.  I know you all make a big deal about that, but it is

22  under oath.  I swear them in.

23       MR. BROWNE:  Right, and he'd be cross-examined by a

24  defense team that features the same firm that represented him.

25  That's a problem.

Motion to Disqualfy Counsel

1          THE COURT:  It's not a comfortable thing.  What's the

2     solution to that problem?

3          Your solution to that problem is, the law firm is out.

4          MR. BROWNE:  Sure.  There are plenty of other qualified

5     lawyers, Judge, and in fact Mr. Schneider --

6          THE COURT:  I know, but the problem in balancing is

7     that Mr. Schneider can choose his lawyer.  I don't choose him

8     for him, let alone you, right?  And then we have an issue, and

9     the issue is, is he getting a lawyer of his choice.

10         So no matter what, we're going to have an issue.  So my

11    goal always is to have the least number of issues for the Court

12    of Appeals in the event that there's a conviction, in addition

13    to doing the right thing and following the law.

14         So your solution is ban the law firm.

15         MR. BROWNE:  Disqualified only Mr. Rashbaum and

16    Ms. Green.  He has local counsel.

17         THE COURT:  But allow the other lawyers who are in the

18    same firm.

19         MR. BROWNE:  No, Your Honor.

20         THE COURT:  Who are the other lawyers?

21         MR. BROWNE:  Mr. Sorkin, Mr. Sondhi, Mr. Schoeppl, all

22    of whom have represented this defendant since 2016.

23         THE COURT:  But did they file a Notice of Appearance in

24    this case?

25         MR. BROWNE:  In this case.

1          THE COURT:  All of those lawyers have filed.

2          MR. BROWNE:  He has all of those lawyers working for

3    him.

4          THE COURT:  My goodness gracious.  You're going to have

5    all those lawyers here at that trial --

6          MR. RASHBAUM:  No.

7          THE COURT:  -- because maybe I will have a limit as to

8    the number of lawyers.

9          MR. RASHBAUM:  No, so, Judge, let me clarify.

10          THE COURT:  Okay.

11          MR. RASHBAUM:  Lead counsel at trial is Ike Sorkin who

12    is a New York based lawyer.  Mr. Sondhi, who's referenced, is no

13    longer practicing at the law firm full time.

14          THE COURT:  Is he the professor, the former professor?

15          MR. RASHBAUM:  No, he's not.

16          THE COURT:  Different professor.

17          MR. RASHBAUM:  He's a junior partner at Mr. Sorkin's

18    law firm.

19          THE COURT:  Okay.

20          MR. RASHBAUM:  He will not be at the trial.

21    Mr. Schneider --

22          THE COURT:  Now being at the trial is a different

23    issue, because you could be -- you're still a lawyer, but we'll

24    get through that eventually.

25          MR. RASHBAUM:  He's not going to be participating in

1  any way from my understanding at the trial.

2          So he's got Mr. Sorkin, who's a New York lawyer.

3  Mr. Schoeppl is counsel, has also filed an appearance.

4  Mr. Schoeppl handled Mr. Schneider's SEC case.

5          THE COURT:  Okay.

6          MR. RASHBAUM:  Mr. Schoeppl has not withdrawn his

7  appearance because of this.

8          THE COURT:  Okay.

9          MR. RASHBAUM:  He will be withdrawing his appearance.

10  He will not be representing Mr. --

11          THE COURT:  Well, he'll move to withdraw --

12          MR. RASHBAUM:  Yes, Your Honor.

13          THE COURT:  -- his appearance which may not be granted

14  depending on what I do.

15          MR. RASHBAUM:  Yes, Your Honor.

16          THE COURT:  He's from New York, too?

17          MR. RASHBAUM:  No, he's from Florida.

18          THE COURT:  So he knows that filing a Notice of

19  Appearance is what marriages used to be like, you're in it for

20  life.  In fact, you're here even for appeal according to former

21  Chief Judge Tjoflat in the Eleventh Circuit unless someone does

22  something.  So he's in it unless I let him out.  Money has

23  nothing to do with it unless there's an absolutely conflict.

24          MR. RASHBAUM:  It doesn't have to do with money.

25          THE COURT:  It does?

1          MR. RASHBAUM:  It does not.

2          THE COURT:  Okay.

3          MR. RASHBAUM:  There are other issues regarding his

4    representation which I prefer not to get into at this point.

5          THE COURT:  Of conflicts?

6          MR. RASHBAUM:  There may be.

7          THE COURT:  Oh, my goodness.  See, I like clean cases.

8          MR. RASHBAUM:  Look, Judge, he's not going to be

9    Mr. Schneider's lawyer.  Okay.  Simple and clear.  He's not

10   going to be.  In any scenario, he's not going to be

11   Mr. Schneider's lawyer.

12         THE COURT:  So who's left?

13         MR. RASHBAUM:  So Sorkin is left, the New York lawyer.

14         THE COURT:  So if he comes in, the Government has no

15   problems.

16         MR. BROWNE:  And an associate from his law firm, we've

17   been dealing with as well.

18         MR. RASHBAUM:  She will not be -- depending on what

19   happens here, she will likely not be participating in the case.

20         THE COURT:  Well, I'm not here to choose who the lawyer

21   is.  I'm here to find conflict-free lawyers for many reasons.

22         We have to balance all these interests, right?  And I

23   take this seriously.  He has the right to have a lawyer of his

24   choice.  The money doesn't bother me as long as he understands

25   and the lawyers understand.

Motion to Disqualify Counsel

```
1              I'm bothered by the issue of someone, just like I was

2    in the other case -- who is going to cross-examine Mr. Rose?

3              MR. RASHBAUM:  Mr. Sorkin is, Your Honor.  We mentioned

4    that in our papers.  I will have nothing to do with Mr. Rose's

5    cross-examination.

6              THE COURT:  Okay.  But someone in your law firm

7    represented Mr. Rose.

8              MR. RASHBAUM:  Previously, yes.

9              THE COURT:  Who's that?

10             MR. RASHBAUM:  Mr. Neiman and Mr. Pineiro believe.

11             THE COURT:  And he likes Mr. Pineiro.  I'm not

12   suggesting he doesn't like Mr. Neiman, but that was in the

13   transcript a lot, right?

14             MR. RASHBAUM:  That's what he said, yes.

15             THE COURT:  He considers him a friend, and you even in

16   your argument said, we treat our former clients as colleagues,

17   right?  I think you said something like that.

18             MR. RASHBAUM:  Something like that, I'm sure.

19             THE COURT:  Which is fine, but see, that's the problem.

20   You normally do not like to cross-examine your colleagues unless

21   it's fun, you know, but not in a proceeding, right?  That would

22   be uncomfortable, wouldn't it?

23             MR. RASHBAUM:  So Judge, it would be, and that's why

24   I'm not cross-examining him.

25             THE COURT:  Okay.  But then we get to the crux of the
```

1  problem, that when we look at a firm, everybody is in it

2  together, and maybe if it was a huge firm in a civil case where

3  they're in different floors -- though maybe that doesn't make

4  any difference with computers now -- but it's a small firm.

5       When it's a small firm and a good firm, what you all do

6  when you go out to lunch is, you say, how are we going to deal

7  with this case?  God, we've got Moreno again.  How unlucky can

8  we get?  What do we do?  How do we get out of this?  What do we

9  do?  I mean, that's a perfectly normal thing.  How do we

10 cross-examine this guy?  Well, I know all about him.  We're

11 friends.  I've been his lawyer, but I can't say anything about

12 it.

13      It doesn't look good you would concede.  Does it look

14 good?  You'll concede that, that it doesn't look good.

15      MR. RASHBAUM:  I won't concede that, no.

16      THE COURT:  You won't concede anything.

17      MR. RASHBAUM:  No, I'll concede plenty, Judge, but not

18 that.

19      I mean, I'm an officer of the court, and what I'm

20 telling you is, I've never had discussions about Mr. Rose's case

21 and what I'm telling you --

22      THE COURT:  I know, but it's the firm though.

23      MR. RASHBAUM:  I'm never going to have discussions with

24 Mr. Neiman or Mr. Pineiro about Mr. Rose's case, and if anyone

25 were to be complaining about that, it would be Mr. Schneider.

1          THE COURT:  I said that.  That's the first thing,

2    because if Rose -- Let me put it this way:

3          If Rose were now a codefendant in this case, you'd be

4    in the same pickle as with the husband and wife case, and before

5    I rule, I would say get a separate lawyer.  I'm not going to

6    have someone cross-examine a codefendant.

7          This is different.  So, I put aside the fact that it's

8    different.  If there's a waiver, it makes it easier, but there's

9    still a problem.  There may be a solution to it, but it's still

10   a problem, and the reason I like to have the defendant -- he's a

11   lawyer himself?

12         MR. RASHBAUM:  Yes, Your Honor.

13         THE COURT:  So he knows.  I mean, he understands.

14         Now, in civil cases conflicts can more easily be

15   waived, but in criminal -- I don't want a case to go all the way

16   to the Court of Appeals.  I don't think it can go before trial.

17   I don't know.  I've never seen it.  Can it go before trial?

18         MR. BROWNE:  Based on my research, it's not a ground

19   for interlocutory appeal.

20         THE COURT:  So then it's unfortunate.  They like final

21   judgments and then they look at everything.  Then I would make

22   sure there would not be -- I'm not suggesting -- he's obviously

23   presumed innocent.  You all know that.  If he's found not

24   guilty, there's no problem with that.  Rose has no proceeding.

25   So that takes care of that.

Motion to Disqualfy Counsel

1          What happens if Mr. Rose decides at the last minute --
2   and I wish we had Mr. Rose here but I wanted to accommodate your
3   schedules and it's hard to do that -- to say, you know what,
4   I've change my mind.  Let's look at this.  I'm not going to
5   testify.  Why should I?  I've got nothing to gain.  Even though
6   I told the truth, I'm not going to testify.

7          I'm not suggesting he would do that.  If he did that,
8   obviously, it makes my problem go away and the issue goes away,
9   but what happens?

10          What would you do at that time?  You, Mr. Duffy,
11  whoever is going to speak.

12          MR. BROWNE:  Normally, if this had been done correctly,
13  we'd pick up the phone and speak with Mr. Pineiro and
14  Mr. Neiman, who whom we've had a dialogue for years about his
15  cooperation, about the fact that --

16          THE COURT:  But a defendant says, you know what?  This
17  is getting -- how old is Mr. Rose?

18          MR. BROWNE:  He's in his 70s, almost 80 years old.

19          THE COURT:  As you get older, you say, I don't need
20  this kind of stuff.

21          I'm starting to think that a little bit.

22          I don't need this kind of stuff, I'm out.  The lawyers
23  are going to force him, right?  It's his decision.  Then what
24  happens?  You give him immunity.  Does he have immunity?

25          MR. BROWNE:  At this point jeopardy is attached in his

1  case.

2         THE COURT:  So in your view, he would have immunity.

3  You can give him double immunity by saying whatever he says,

4  which, of course, makes it easier to cross-examine -- and what

5  happens if he still doesn't testify?

6         You hold him in contempt and throw him in jail?

7         MR. BROWNE:  There are two problems.  One, he signed a

8  Plea Agreement which he promised to cooperate with the United

9  States.

10        THE COURT:  What do you do with that?

11        MR. BROWNE:  Well, interestingly, that Plea Agreement

12  is also signed by somebody in Mr. Rashbaum's frim.

13        THE COURT:  I understand that and that's why we're

14  having a hearing, because I have a concern but I want to be

15  practical.

16        So what would you do if he doesn't?  You would vacate

17  the Plea Agreement about a sentence he's already served that has

18  already been reduced.

19        MR. BROWNE:  Probably not, but I would have a real

20  concern that in coming to that decision, he's being represented

21  by somebody that this law firm picked and that this law firm

22  paid and there's an issue with the money, Judge.

23        THE COURT:  How about the solution of giving him

24  another lawyer?

25        MR. BROWNE:  For Mr. Rose?

1         THE COURT:  Yeah, and then that takes care of that

2    problem.

3         MR. BROWNE:  It does --

4         THE COURT:  If that's the problem, that's easier

5    solved.

6         MR. BROWNE:  Well, here's the issue:  The money that

7    supposedly was on credit with Mr. Rashbaum's firm, that's an

8    issue for the Government for one reason, that Mr. Rose has a $2

9    million, 2.4 million dollar judgment against him.  That money to

10   the extent it actually exists, and I'm not sure it does, but to

11   the extent he had a credit, why that money was never given back

12   to him by Mr. Rashbaum's firm, I don't know.  Why Mr. Rashbaum's

13   firm got to make the decision that they were going to transfer

14   that money to another lawyer who's going to represent Mr. Rose

15   in connection with this manner, this disqualification matter --

16   that's pretty unseemly, and then you have the issue of that

17   money should have been paid towards forfeiture because he owes a

18   considerable amount of money to the Government.

19        THE COURT:  Who's the judge in the Rose case?

20        MR. BROWNE:  Judge Martinez.

21        THE COURT:  A fine judge, and I'm sure he's got enough

22   cases to worry about.  I don't think he wants to revisit an old

23   case that closed when?  When was that case closed?

24        MR. BROWNE:  He was resentenced in January of --

25        THE COURT:  No, when was he originally sentenced?

Motion to Disqualify Counsel

1          MR. BROWNE:  Original sentencing?

2          THE COURT:  More or less.

3          MR. BROWNE:  February of last year.

4          THE COURT:  Okay.  So that's the last thing in Judge

5    Martinez' mind, but Mr. Rose mentioned the credit.  What is that

6    all about?

7          MR. RASHBAUM:  Judge, I have no idea.  I don't know

8    anything about --

9          THE COURT:  You didn't read the transcript?

10         MR. RASHBAUM:  No, I was there when he said it, but I

11   don't know anything about Mr. Rose's case, about what he paid

12   the law firm.

13         THE COURT:  But it's your law firm, too.  It's your

14   money.  I don't want to get into the private matters of a law

15   firm unless I have to, but I don't want to because it's normally

16   none of my business.

17         You know, when I had partners, we were four and three,

18   we shared everything equally, no matter who brought it in.  I'm

19   not suggesting that's what people should do because times are

20   different, but everybody was in on it and that means it doesn't

21   matter who brings it in, you're sharing the money.  So just not

22   talking about it doesn't mean that there's not a problem.

23         MR. RASHBAUM:  No, but Judge --

24         THE COURT:  Shouldn't I find out what that's all about

25   since Mr. Rose mentioned it?

1          MR. RASHBAUM:  Sure.

2          THE COURT:  Who can answer that, Mr. Pineiro?

3          MR. RASHBAUM:  I think Mr. Neiman or Mr. Pineiro.

4          THE COURT:  Okay.  Now, if he says something, then you

5    know about it.

6          MR. RASHBAUM:  Right, but I'm trying --

7          THE COURT:  See?  How can you not know what your

8    partners are going to say about the money that's in a firm?  Oh,

9    my goodness.  That should be, other than vigorous

10   representation, should be the number two issue in every law

11   firm, right?

12         MR. RASHBAUM:  Judge, let me just be clear because I

13   want to make sure we're on the same page.

14         THE COURT:  Okay.

15         MR. RASHBAUM:  When we walled myself off from

16   Mr. Rose's case, I'm walled off from his case.  I don't know

17   anything about -- I've never seen his Engagement Letter.  I've

18   never talked to Mr. Rose.  I don't know what he paid the law

19   firm.  I don't know what he was paid back.  I don't know

20   anything about his hiring of Mr. Fasano.

21         THE COURT:  I'm not sure whether being totally ignorant

22   resolves the problem.

23         MR. RASHBAUM:  I'm just telling you I don't have the

24   answers to the questions.

25         THE COURT:  Okay.  I respect that.  Now, if you have

1    the answers right now about your own firm here in open court,

2    how does that change anything?

3         MR. RASHBAUM:  Then I would hear it like you would hear

4    it.

5         THE COURT:  I know, but I don't have a conflict --

6         MR. RASHBAUM:  Right, but Judge, all I'm saying is --

7         THE COURT:  -- potential or of any type.

8         MR. RASHBAUM:  Judge, all I'm saying to you is the

9    first I ever heard about how he was being paid or what he was

10   being paid --

11        THE COURT:  Was in the hearing.

12        MR. RASHBAUM:  -- was when Ms. Louis heard it.

13        THE COURT:  See, it's not a good thing -- I read

14   fast -- when I have so many paper clips in a transcript.

15        But you've spoken with Mr. Schneider.  He has no

16   problem even after the hearing with any of this.

17        MR. RASHBAUM:  No, Your Honor.

18        THE COURT:  Okay.  I mean, I'm going to ratify that,

19   but it's good for him to hear all of this, because sometimes it

20   crystalizes it.

21        Do you understand that, Mr. Schneider?

22        THE DEFENDANT:  Yes, I do, Your Honor.

23        THE COURT:  You understand that that means, whatever

24   decision is taken here, the first and foremost interest that we

25   all have, for different reasons, is that you have the

1    representation that you have chosen, but that means since you

2    have chosen it, you've got to live with the decision that you

3    have made forever.  Do you understand that?

4            THE DEFENDANT:  Yes, I'm very comfortable with that

5    decision.

6            THE COURT:  That means you, yourself, could never, ever

7    complain about any conflict; whoever is going to cross-examine

8    Mr. Rose if he testifies, if you don't think it was vigorous

9    enough, if they were somewhat hampered by the privileged

10   communications, by this wall?

11           And how many lawyers are in your firm?

12           MR. RASHBAUM:  Well, it varies, but I think it's just

13   south of --

14           THE COURT:  It varies, how many lawyers you have in

15   your firm?

16           MR. RASHBAUM:  I think it's around 10.

17           THE COURT:  Okay.  It's not a huge firm.

18           MR. RASHBAUM:  Two offices, around 10 lawyers.

19           THE COURT:  Okay.  So 10 lawyers.  So the wall, maybe

20   it's kind of like a curtain when a law firm is that --

21           MR. RASHBAUM:  Well, it's all computer oriented now

22   though.

23           THE COURT:  I know, I know, but you all talk about it.

24   That's the wonderful thing about a small firm.

25           MR. RASHBAUM:  That's what you say, but we really don't

1    talk about it.

2              THE COURT:  All right.

3              But you understand, Mr. Schneider?  So the first thing

4    is, the prosecutor is doing this because it's the right thing to

5    do, but they're interested in getting a conviction because they

6    think that's the right thing to do also.

7              That means you will never be able to raise who the

8    lawyers were.

9              THE DEFENDANT:  Yes, I understand that.

10             THE COURT:  You understand that 100 percent?

11             THE DEFENDANT:  Yes, I'm very comfortable with that.

12             THE COURT:  How about the issue of money, who's paying

13   for what representation or anything?  Do you have anything to

14   say about that?  You're giving up any right to complain about

15   that.

16             THE DEFENDANT:  That would not affect at all my

17   determination to have the firm represent me.

18             THE COURT:  And once you have a lawyer, you keep him

19   for the trial, you even keep him for the appeal, but there's a

20   little bit of wiggle room for that.

21             Do you understand you can't in the middle of trial or

22   right before we pick a jury say, you know what, now, I thought

23   about what you said to me, and after what Magistrate Louis said,

24   I've changed my mind and I don't want any of these guys?  I want

25   to have a new lawyer.

Motion to Disqualify Counsel

1           It's not going to happen since I'm giving you the
2    chance now in early June to do that.  Do you understand?
3           THE DEFENDANT:  Yes.  I appreciate your concern, but I
4    have no problem whatsoever with that condition.
5           THE COURT:  All right.  All right.  Should I ask him
6    anything else?
7           MR. BROWNE:  I want to clarify just a couple of things.
8    As far as whether Mr. Rashbaum had discussion with his partners
9    about this case, previously in our dialogue we were told by
10   Mr. Rashbaum that he spoke to Mr. Pineiro -- was it following
11   Mr. Rose's sentencing?
12          MR. RASHBAUM:  No, I think it was -- I don't know which
13   one it was.  I was in court with you, Your Honor, in trial in
14   here and Mr. Pineiro came in and he said, I just had -- I don't
15   know if it was a Rule 35 or sentencing, I think it was a Rule
16   35, and I said, how did it go?  And he said, it went well.  That
17   was my only conversation with Mr. Pineiro about Mr. Rose's case.
18          That's what I told you.
19          MR. BROWNE:  And then in the transcript of the hearing,
20   I noticed something interesting.  Mr. Rashbaum said --
21          THE COURT:  Oh, I can tell there's no love lost here.
22          MR. BROWNE:  Well, it's not a question -- it's not
23   personal.  It really isn't.
24          THE COURT:  Just business, I know.
25          MR. BROWNE:  Mr. Rashbaum said --

1          THE COURT:  There was an old movie like that.

2          MR. BROWNE:  -- that he spoke to his co-counsel,

3    Mr. Sorkin, about what Rose might and might not say during his

4    testimony.  He said that based on his conversations with

5    Mr. Sorkin, he believed that that testimony would not be

6    materially adverse to Mr. Schneider.  So now Mr. Rashbaum is

7    talking about his former client with Mr. Sorkin and what he

8    might or might not say at trial.

9          This is precisely the problem.  That is why

10   disqualification --

11         THE COURT:  Well, does your case revolve around

12   Mr. Rose?

13         MR. BROWNE:  He's a key witness.  He called

14   Mr. Schneider a co-conspirator in his Plea Agreement.

15         THE COURT:  You put that in here.  I read that.

16         If Rose at the end -- I'm not suggesting he would and I

17   don't even know him except what I've read here -- maybe this

18   case should be handled by Mr. Martinez.  I wonder how many cases

19   I should take in exchange, but if Rose didn't testify and said,

20   for whatever reason, you know what, I'm going to be 80 years

21   old.  I've had it.

22         He lives in Orlando?

23         MR. BROWNE:  Well, as of right now, I think he's in a

24   halfway house.

25         THE COURT:  I know, but is that where his home is, too,

Motion to Disqualify Counsel

1    or not?

2            MR. BROWNE:  I believe he's from Sarasota.

3            THE COURT:  You don't know anything about that, right,

4    Mr. Rashbaum?

5            MR. RASHBAUM:  I don't know where he lives.

6            THE COURT:  Who knows?

7            MR. BROWNE:  I think he's from Sarasota.

8            THE COURT:  State your name for the record whoever is

9    going to speak.

10           MR. NEIMAN:  Your Honor, would you like me to go to the

11   podium?  Jeff Neiman.

12           THE COURT:  Yes.  Why don't you?  You can share the

13   lectern, yes.

14           I used to call it a podium, and Judge Gonzalez

15   corrected me when I was a young lawyer.

16           MR. NEIMAN:  What is the appropriate term then?

17           THE COURT:  He said it was a lectern, and he was at one

18   point the smartest trial judge in this district.  I think now

19   it's Judge Altonaga.

20           MR. NEIMAN:  Your Honor, I think the Government --

21           THE COURT:  Okay.  Who do you represent?  Who are you

22   and who do you represent and what is your firm?

23           MR. NEIMAN:  Jeff Neiman with Marcus Neiman and

24   Rashbaum formerly representing Sheldon Rose.

25           THE COURT:  Formerly representing?

1          MR. NEIMAN:  Correct.

2          THE COURT:  And Mr. Pineiro is with which firm?

3          MR. NEIMAN:  He's with the same law firm, also formerly

4    representing Mr. Rose.

5          THE COURT:  Okay.  Who's going to represent Mr. Rose

6    when he comes in to testify?

7          MR. NEIMAN:  Mr. Rose has currently hired Mr. Michael

8    Fasano.

9          THE COURT:  Not Pasano, but Fasano.  Okay.  And the

10   reason he's done that is because?

11         MR. NEIMAN:  He asked us for a recommendation.

12         THE COURT:  He said that.  I think he even quoted

13   Mr. Pineiro.  He said, we're better off -- I mean, I'm not doing

14   it word for word, because I don't have it memorized.  I just

15   read the transcript.  Let's find out.  Let's get somebody else,

16   right, because Mr. Pineiro, who was complimented I think even by

17   the prosecutor at that hearing, right, said we need to find out

18   more and get a separate lawyer, right?

19         MR. NEIMAN:  I did not review the transcript, Your

20   Honor, nor was I at the hearing but --

21         THE COURT:  I think so.  That's all I know.

22         MR. NEIMAN:  I'll defer to your memory on it.

23         THE COURT:  I mean, if I'm wrong -- you guys were

24   there.  It was something like that?

25         MR. BROWNE:  Sounds right.

Motion to Disqualfy Counsel

30

1          MR. RASHBAUM:  Yes, Your Honor.

2          THE COURT:  All right.  They both agree.  We might as

3   well take that.

4          So there was an issue at one point.  Fasano has

5   resolved that issue.

6          MR. NEIMAN:  Correct, Your Honor.

7          THE COURT:  So you're no longer going to do anything in

8   this case.

9          MR. NEIMAN:  Nothing.

10          THE COURT:  Mr. Pineiro is not going to do anything in

11   this case.  Right, Mr. Pineiro?

12          MR. PINEIRO:  No, Your Honor.

13          THE COURT:  You mean yes, right?

14          MR. PINEIRO:  Yes, Your Honor, I'm not doing anything

15   in this case.

16          THE COURT:  It's the way I asked it.  It was wrong.

17          Okay.  But you guys are in the same firm.  So what are

18   we going to do with privileged communications, whatever Rose

19   said that may be inconsistent or consistent with this case?

20   Then what happens with that?

21          MR. NEIMAN:  Your Honor --

22          THE COURT:  Do you have notes?  When you interview

23   people, you take notes?

24          MR. NEIMAN:  We do and we also have notes of

25   conversations with the Government as well.

1          THE COURT:  And you have a file.

2          MR. NEIMAN:  Correct, Your Honor.

3          THE COURT:  You all keep files?  It's all computerized.

4          MR. NEIMAN:  It's all stored on our server, Your Honor,

5    which Mr. Rashbaum and Ms. Green have been --

6          THE COURT:  -- told don't get in.

7          MR. RASHBAUM:  No, we can't get in.

8          MR. NEIMAN:  They can't get in.

9          THE COURT:  They can't get in because they're not

10   computer literate or they can't get in because they're told not

11   to get in?

12         MR. NEIMAN:  No, because we had an IT person or IT

13   company --

14         THE COURT:  Block them.

15         MR. NEIMAN:  -- block them.

16         And Your Honor, your concerns I do --

17         THE COURT:  But you talk about it.  You didn't talk

18   about this case at all?  You don't talk?  You have so many cases

19   that you don't talk about them?  If you do, it's a lucky thing.

20   Maybe you should have one less case, so you can work on the

21   others.

22         MR. NEIMAN:  Your Honor, you know, we always would like

23   more work, but the reality is, Your Honor, we talk about some

24   cases.

25         This case, I've never discussed it with Mr. Rashbaum

1  nor Ms. Green.

2        Mr. Pineiro can say the same, beyond updating on

3  scheduling and where we are, never the substance of this case.

4        THE COURT:  Why did you do that?

5        MR. NEIMAN:  Because it would have come up, like where

6  are you going to be?

7        But, Your Honor, we did recognize this as an issue

8  obviously, and as soon as we were hired by Mr. Schneider, we

9  consulted with an ethics counsel before Mr. Rashbaum ever

10  entered an appearance in this matter, attorney Skip Culver up in

11  West Palm Beach.  I believe he was on the Florida Bar

12  Professional Commitment at some point.  He may currently still

13  be there as well.

14        Look, I think it's good practice to bounce things off

15  of them whenever there's anything of any substance.  I disclosed

16  to Mr. Culver all the facts relating to our representation of

17  Mr. Rose as well as what the potential representation of

18  Mr. Schneider would be, and he was the one who actually drafted

19  the waiver that ultimately was executed by Mr. Rose and by

20  Mr. Schneider.  So I think --

21        THE COURT:  It didn't seem like Mr. Rose was right on

22  top of everything on the waiver.  I didn't hear him, so I don't

23  know.  I only read the transcript so --

24        MR. NEIMAN:  I totally appreciate --

25        THE COURT:  It may have to do with the phone.  You

 1  couldn't hear well or something.

 2          MR. NEIMAN:  And that's where I understand the Court's

 3  concern of wanting to hear from the horse's mouth --

 4          THE COURT:  Oh, Yeah.

 5          MR. NEIMAN:  -- every which way, and I would concede

 6  that if Mr. Rose wavers on his waiver, then this case is in a

 7  very different posture and from there appropriate steps would be

 8  taken.  But I think until that moment happens, I think that

 9  we're in accordance with the Bar rules.  We've taken the

10  precautions to ensure that the confidential and privileged

11  information, which was never shared, cannot be shared.

12          THE COURT:  But you're in the same firm.  It doesn't

13  bother you.  It bothered you enough to get another lawyer.  If

14  it bothered you enough to get an opinion and another lawyer,

15  shouldn't it bother you enough in a trial where your client's

16  freedom is at stake?  That's more important.

17          MR. NEIMAN:  That's Mr. Schneider's waiver issue and it

18  bothered us that we looked at the Florida Bar Rules and we

19  followed them to a T.

20          THE COURT:  All right.  Now, his point,

21  Mr. Schneider's -- judge, you've got to balance it out.

22  Sometimes people come in with lawyers who are not as good as

23  other lawyers, and you're saying, oh, my goodness, they paid

24  this lawyer money and he's one of the worst lawyers but he's

25  retained.  This guy would be much better off with a Federal

1    Public Defender.  I don't get involved in that.

2          As long as it meets Strickland versus Washington,

3    effective assistance of counsel, I don't get involved.

4          Why should I get involved if that's what this defendant

5    wants to do?  Who am I protecting?

6          MR. BROWNE:  The court and the appearance of

7    impropriety that's created here.  The Court has a dog in this

8    fight.

9          If you read the Ross case, that's actually what they

10   focused on because in Ross, you had a waiver from the defendant,

11   and if you look at the cases interpreting Ross, you had a waiver

12   from the cooperators as well and the Court said, it doesn't

13   matter, because there's insurmountable conflict.

14         Ross' facts are almost identical to these, almost

15   identical.  There are three lawyers involved, and the Court can

16   read the case for itself, but if the Court looks at Ross

17   closely, it will see that in Ross you had waivers from the

18   parties, but it doesn't matter because there was something

19   really wrong with that same firm seeking to represent a

20   cooperator and the defendant was going to trial and that's

21   exactly what we have here.

22         THE COURT:  But that cooperator, his case was totally

23   done.

24         MR. RASHBAUM:  No.

25         MR. BROWNE:  In Ross?

1          THE COURT:  Yeah.

2          MR. BROWNE:  Well, he was going to testify for the

3   Government, so I don't know if that counts as the case being

4   done or not, and I don't know why it matters.

5          THE COURT:  Of course it matters, because if there's an

6   interest -- it matters, for example, if the person in Ross was a

7   codefendant before me, I probably wouldn't even be talking to

8   you, I'd be talking to Mr. Rashbaum and try to talk him into

9   getting out of the case, like I did his partner, Mr. Marcus.  I

10  mean, that's what I would be doing.  I have two defendants.  I'm

11  there to protect the defendants' right?

12          Here this defendant, we're not talking about some

13  individual who just got off the boat from a foreign country and

14  doesn't know what's going on.  We're talking about a lawyer

15  who's intelligent who understands what's going on.  You would

16  concede that, right?

17          MR. BROWNE:  That he's intelligent?

18          THE COURT:  Yes.

19          MR. BROWNE:  I assume he is.

20          THE COURT:  See, you're not in a concessionary mood

21  either, but that's fine.  That's fine.

22          So he lives with the consequences of his decision

23  forever.  It makes your job easier.

24          Rose has nothing else to gain or to lose by this,

25  agreed?

1          MR. BROWNE:  I would disagree.

2          THE COURT:  What does he have to lose?

3          MR. BROWNE:  The privilege, the confidentiality of his

4    communications.

5          THE COURT:  Okay.  I'm going to put that one aside,

6    good point, but putting that aside, it's not your typical

7    cooperator where the cross-examination is going to be, and you

8    could have received life and now the prosecutor is going to ask

9    the judge to reduce it to probation.  We're not going to have

10   any of that cross, right?

11         MR. BROWNE:  I think that if defense counsel didn't

12   inquire about a 57 percent reduction that he got as a result of

13   Mr. Rashbaum's firm good work --

14         THE COURT:  He would be in effective.

15         MR. BROWNE:  -- he would probably not be doing a very

16   good job, but I don't know and you're right, it's a different

17   type of case.  It's not a -- we're not going to attack this

18   cooperator.

19         THE COURT:  So if I want to defend the court and the

20   system, I've got to balance it out with the right of a defendant

21   to have the lawyer of his choice, good or bad.

22         I don't necessarily think -- you already can tell that

23   I would prefer black and white.  I prefer to have different

24   defendants have different lawyers, makes it clean, everybody is

25   in on it.  But two things happen:  One thing is not important to

1  me.  The lawyers lose a client, such is life.  I'm sure it's not

2  the first nor last time that will happen.  The defendant losing

3  his lawyer, he has an issue on appeal if he is convicted, and

4  then you've got to defend it.

5        MR. BROWNE:  And Judge, based on the Court's

6  experience, what are the chances that he's not going to raise

7  the opposite issue in a 2255 on appeal if the Court rules in the

8  Government's favor, or in the defendant's favor?  He's going to

9  raise it no matter what.

10       THE COURT:  Well, he's got less of a chance if he kept

11  the lawyer he wanted than if he was forced to have another

12  lawyer.  Then I have to get into, can he afford it?  You don't

13  have any problems with the other lawyers from New York represent

14  him?

15       MR. BROWNE:  No.

16       THE COURT:  What's wrong with that, you know?  What's

17  wrong with New York lawyers?  Sometimes they get arrogant, but

18  we have enough arrogant lawyers here, too.  What difference does

19  it make?

20       MR. RASHBAUM:  Judge, Mr. Schneider and the New York

21  lawyers want a Miami lawyer, and in particular, they want me.

22  Now, that may be silly, you may think that's silly, they may be

23  making a bad decision by wanting me, but for one reason or

24  another, Mr. Schneider thinks that myself along with Ike Sorkin

25  are his best chances of proving his innocence.

Motion to Disqualify Counsel

1          THE COURT:  Well, with Sorkin we have no problems with,

2     right?

3          MR. RASHBAUM:  No.  I mean, not that I know of.

4          THE COURT:  But there's a problem with you, because of

5     past representation of your partners of Mr. Rose who's going to

6     not just cooperate, but according to the prosecutor, bury your

7     client.  "Bury," see, I speak like that because --

8          MR. RASHBAUM:  Judge, if you don't mind, let me respond

9     to what was said earlier.

10          THE COURT:  Go ahead.

11          MR. RASHBAUM:  I never had any discussions with

12     Mr. Sorkin about what Mr. Rose would say, with me saying what

13     Mr. Rose would say.

14          THE COURT:  But think about this:  So how can you go to

15     trial and represent someone and not do the due diligence that

16     you need to do to cross-examine what the Government says is a

17     very important witness.

18          MR. RASHBAUM:  Mr. Sorkin does not believe he's a very

19     important witness.  Let me say that off the bat.  Mr. Schneider

20     does not believe he's a very important witness.  Let me say that

21     right off the bat.

22          And let me say this: The rules provide that you can do

23     it.  This is a waivable conflict.  If the rules didn't provide

24     for it -- I mean, look, there are nonwaivable conflicts.  This

25     is a waivable conflict.

1          THE COURT:  Like what?  What's a nonwaivable conflict?

2          MR. RASHBAUM:  If we still represented that client and

3    there was a conflict of interest directly.

4          THE COURT:  What do we do with privileged

5    communications?

6          MR. RASHBAUM:  What do you mean?  I don't have any

7    privileged communication.

8          THE COURT:  But your firm does.

9          MR. RASHBAUM:  But the rules provide that it's okay.

10   The rules provide.  It's a prior client.

11          I mean, if it was a problem with privileged

12   communications, there would be no provision in the rules

13   allowing for this to be a waivable conflict.  I mean, they made

14   a waivable conflict for a reason, so that it could sometimes be

15   waived.

16          THE COURT:  You can almost waive anything, right?

17   People have waived everything and even been sentenced to death.

18          MR. BROWNE:  One thing you can't waive is a dual

19   representation.  That's not waivable and Mr. Rashbaum will

20   concede that under Florida Bar Rules a dual representation is

21   not waivable and that's what happened here.

22          THE COURT:  When was the dual representation?

23          MR. BROWNE:  On March 21st when Mr. Rashbaum entered an

24   appearance on behalf of Mr. Schneider and Mr. Pineiro told us

25   that he would represent Mr. Rose at the trial of this case.

1          THE COURT:  And what did you say?

2          MR. BROWNE:  I said, great.  I mean, that was

3   consistent with the dialogue we had for more than a year.  He

4   said, we're going to represent Rose.  We're going to put

5   prophylactic measures in place.  I think he used the older term,

6   the Chinese wall.  We're going to put it in place.  We're going

7   to get a waiver, but we're going to represent him at trial on a

8   pro bono basis.  That's what Mr. Pineiro said.

9          THE COURT:  Represent Rose?

10          MR. BROWNE:  Rose, as a cooperator.

11          THE COURT:  Did you?

12          MR. RASHBAUM:  You have to ask Mr. Pineiro and

13   Mr. Neiman.  I have no idea what was said to them regarding

14   Rose.

15          THE COURT:  Whoever wants to speak.

16          MR. NEIMAN:  Your Honor --

17          THE COURT:  Did you say that?

18          MR. RASHBAUM:  That's a Pineiro question.

19          THE COURT:  Okay.  Well, I was looking at him.

20          MR. PINEIRO:  Your Honor --

21          THE COURT:  I assume these are the only three cases you

22   have where there are conflict issues, right, Mr. Rashbaum?

23          MR. RASHBAUM:  Judge, I don't believe -- I mean, I

24   don't know the answer to that either.  We've had three.

25          THE COURT:  Oh, my goodness gracious.

Motion to Disqualfy Counsel

1    MR. RASHBAUM:  Judge, we've had three cases that have

2  had with conflict issues that I know of.

3        THE COURT:  Two of them are mine.

4        MR. RASHBAUM:  Two of them are yours.

5        THE COURT:  One is Judge Altonaga's.

6        MR. RASHBAUM:  And one of them was Judge Altonaga's,

7  yes.

8        THE COURT:  Okay.  Shirley, remind me to buy a lottery

9  ticket this week.

10        Go ahead.

11        MR. PINEIRO:  Judge, if the Government could tell me

12  the date of that conversation -- I reviewed my notes prior to

13  this hearing.  If they would provide me with a date of that

14  conversation -- what I can tell you is the representation is

15  over.  The Court has aptly identified the issue.

16        Once jeopardy attaches and you have a resentencing, we

17  no longer represent Mr. Rose.

18        Now, I'm not a bad lawyer.  I do not discard clients

19  and say I'm not going to help you coordinate with the

20  Government, but the truth is, once that resentencing occurred, I

21  no longer represented Mr. Rose.

22        Now, if Mr. Duffy emails me and says, when is he being

23  transferred, when is he being released, I'm not going to say,

24  Mr. Duffy, you know, send him an email, figure it out for

25  yourself.  I'm not that kind of a person.

1          Similarly, if Mr. Rose calls me, I'm not going to say,

2     Sheldon, I can't talk to you.  We're done.  You've paid us.

3     That's it.

4          So I don't have a specific recollection of that

5     conversation.  I can review my notes.  I'm glad to come back to

6     the Court.  I've printed out other conversations that I had with

7     the Government, which I can share with the Court at some point

8     in time.  That one I don't have a specific recollection of, but

9     what I can tell you is, we are not in the business of

10    representing individuals after they've been sentenced.

11         It would be completely different, Your Honor, if he was

12    testifying prior to a Rule 35.

13         THE COURT:  Oh, I wouldn't have spent the last 40

14    minutes doing this if that had happened.  I would have quit

15    already.

16         MR. PINEIRO:  Of course.

17         THE COURT:  But this is the feeling I get:  All right.

18    Because you've all told me that some lawyers in the case are

19    saying, for the defense, that what this individual, Rose, is

20    going to say is really of no significance on the one side and

21    it's no big deal.  And the prosecutor says, it's a big deal.  So

22    that's why I'm going to have to bring in Rose.

23         Should I not know what he's going to say?  Has he said

24    that publicly other than there was a proffer.

25         MR. BROWNE:  There's a factual basis in his Plea

Motion to Disqualify Counsel

1   Agreement.

2        THE COURT:  And he admitted to it in front of Judge

3   Martinez, right?

4        MR. BROWNE:  And more importantly, he implicated the

5   defendant.

6        THE COURT:  In open court.

7        MR. BROWNE:  In open court under oath.

8        THE COURT:  When he called him a co-conspirator.

9        MR. BROWNE:  Right.

10       THE COURT:  All right.  See, it seems like the fear of

11  the prosecutor is, though I don't get that from the

12  transcript -- it seems like he wants to testify and will testify

13  and will testify consistently with what he has told you all

14  before.

15       Don't you get that feeling from reading the transcript,

16  and you were there at the phone conversation with the judge?

17       MR. BROWNE:  The Court's concerns about the

18  Government's fears -- and we're not fearful about Mr. Rose

19  backing out or anything like that.  We're concerned with the

20  dual representation.

21       THE COURT:  Because it looks bad.

22       MR. BROWNE:  Your Honor, it looks really bad.

23       THE COURT:  I know.  I agree with you that it looks

24  bad, but sometimes defendants have a right to have a lawyer

25  represent him even if it looks bad.  That's the quandary I'm in,

1  because if not, it seems like that is more important than

2  anything else, because Rose doesn't have any more dog in this

3  fight, except for the privileged communications.

4        And you kind of wonder how if you are confident of what

5  he has told you and what he has said in open court, heck, even

6  if he changed his mine, you could probably bring in the prior

7  inconsistent statements and the jury could hear it.  You might

8  even be able to get that in as substantive evidence, not just

9  impeachment.  I don't know.

10        The reason I'm mentioning all of that is just in case

11 someone -- maybe we should have Mr. Fasano here.  Maybe I should

12 have brought him in, too.  He's here in Miami, right?

13        MR. PINEIRO:  Yes, Your Honor.

14        MR. DUFFY:  Your Honor --

15        THE COURT:  He's going to continue to represent him.

16 So is that your understanding?

17        MR. PINEIRO:  Yes, Your Honor.

18        THE COURT:  Pro bono?

19        MR. PINEIRO:  I don't know the financial terms.  That's

20 Mr. Neiman's --

21        THE COURT:  Does the prosecutor know?  Mr. Duffy.

22        MR. DUFFY:  Your Honor, may I address the Court?

23        THE COURT:  Sure.  You know, they've got three lawyers

24 on one side.  It's only fair, you've got two on this side and

25 another one sitting down over there.

 1          MR. DUFFY:  I want to follow your rules as closely as

 2   we can.

 3          Your Honor, Mr. Pineiro represented to me on a number

 4   of occasions that he would represent Mr. Rose through the trial

 5   of Mr. Schneider.

 6          THE COURT:  Okay.  Now, he can't do that, you agree,

 7   right?

 8          MR. DUFFY:  Not only can he not do it but on the day

 9   that --

10          THE COURT:  So you want me to force him to do what he

11   said?

12          MR. DUFFY:  No, Your Honor, but it's significant

13   because on the day of the arraignment when Mr. Rashbaum entered

14   his appearance, the day before, so on the 21st of March,

15   Mr. Browne and myself and our case agent, Kelvin Ortiz with the

16   FBI, had a conversation with Mr. Pineiro, and Mr. Pineiro said,

17   I will represent him at the trial.  He's out of money.  We will

18   do that pro bono, and we were talking about arranging a meeting

19   with Mr. Pineiro in order to get to Mr. Rose.

20          I previously had been told by Mr. Pineiro to channel

21   communications through Mr. Pineiro, not to reach out to Mr. Rose

22   directly.  That is why we were having the communication with

23   Mr. Pineiro.

24          THE COURT:  Okay.  Let's assume all of that is true.

25          MR. DUFFY:  But there was dual --

```
 1            THE COURT:  Let's assume all of that is true, and let's

 2   assume that at some point they say, you know what?  It's getting

 3   a little too messy.  Let's get out of this before it gets

 4   messier, without conceding whether it violates a rule or whether

 5   the judge is going to get mad.  At one point you say, I'm out.

 6   He's got a separate lawyer.  Doesn't that resolve the issue?

 7            MR. DUFFY:  It does not, Your Honor, because under

 8   Ross --

 9            THE COURT:  We would be better off if he stayed in the

10   case?

11            MR. DUFFY:  No, Your Honor.

12            THE COURT:  We are better off with Fasano in the case,

13   right?

14            MR. DUFFY:  Under Ross --

15            THE COURT:  I know, but we're better off.  We're better

16   off with Fasano than if Pineiro were in the courtroom watching

17   the trial, right?

18            MR. DUFFY:  Your Honor --

19            THE COURT:  Aren't we better off?  That's an easy one.

20            MR. DUFFY:  I don't know.  I don't think so.

21            THE COURT:  Really?

22            MR. DUFFY:  I don't think so.

23            THE COURT:  Even though Fasano is conflict free.

24            MR. DUFFY:  Well, at this point, I don't know what

25   current issues exist between Mr. Pineiro, if any, and Mr. Rose,
```

1  but during a period of time --

2      THE COURT:  He's out.  Pineiro is out now.  Do we worry

3  about past conflicts?

4      MR. DUFFY:  You have to, because there was a dual

5  representation in this case in your case.

6      THE COURT:  During that magical moment.

7      MR. DUFFY:  It's not just that magical moment.  It was

8  time leading up to that.  We don't know when there was agreement

9  or retainer or this supposed -- not supposed, but this now

10  ethics opinion, but what we do know is that for a period of

11  time, there's a dual representation and it's absolutely not

12  allowed and the position out of the box by Mr. Rashbaum was

13  that --

14      THE COURT:  So how come it didn't seem to persuade

15  Judge Louis.

16      MR. DUFFY:  Well, Your Honor, I'm not sure.  We haven't

17  filed our objections yet.  We were planning on it but --

18      THE COURT:  I know, but you made the argument.  You

19  made argument.

20      MR. DUFFY:  We did.

21      THE COURT:  She issued her report.

22      MR. DUFFY:  She did.

23      THE COURT:  So that means you weren't able to persuaded

24  her.

25      MR. DUFFY:  I'm not sure that all of the findings that

1  were made in that R & R are based on record evidence, but in all

2  events --

3          THE COURT:  What's the record evidence?

4          MR. DUFFY:  Well, for example --

5          THE COURT:  You only got the waivers, right?

6          MR. DUFFY:  There was absolutely no discussion or

7  analysis about the dual representation, because once you have

8  dual representation, you cannot have the subsequent

9  representation.

10         THE COURT:  Absolutely.

11         MR. DUFFY:  Absolutely, not possible.

12         THE COURT:  What would happen if he's found guilty?

13         MR. DUFFY:  You can't have the lawyer to begin with.

14         THE COURT:  What would happen if he were to be found

15 guilty?

16         MR. DUFFY:  It would be ineffective, not just

17 ineffective because he would violate --

18         THE COURT:  It would result in a reversal?

19         MR. DUFFY:  I believe so.

20         THE COURT:  Wow.

21         MR. DUFFY:  And not only that, Your Honor, no, it can't

22 be waived.

23         THE COURT:  Be careful because then if it happens,

24 you've conceded reversal.

25         MR. DUFFY:  I agree, Your Honor.  It's that big of a

1    deal.

2            Our motion that was filed, Your Honor, wasn't filed

3    based on just Mr. Browne and myself deciding we're going to file

4    this motion.  It was with our entire supervisory chain including

5    our criminal chief for this case and we just took the decision

6    because of the dual representation that we had to file the

7    motion and the reason that we feel so strongly about it is

8    because of the concept of a dual representation when we have had

9    a year and a half or so, two years of dialogue, through

10   Mr. Pineiro with Mr. Rose, channel through Mr. Pineiro.  We've

11   talked about what Mr. Pineiro -- I mean, Mr. Rose does and

12   doesn't know, to a degree what he can and can't say, what

13   documents he does and doesn't know, et cetera.  And then a

14   lawyer who stands in the shoes under the law with Mr. Pineiro is

15   now our opposing counsel who is presumed under the law to have

16   all of his knowledge, all of his confidential communications,

17   and is now our opposing counsel when we want Mr. Rose to then

18   cooperate against the new defendant.

19           That for us is really almost untenable because we can't

20   have a meaningful dialogue with that potential cooperator.  We

21   can't meet with him, because all of sudden, well, maybe the

22   lawyer is going to be the defense counsel one day.

23           THE COURT:  But that has been resolved with a new

24   lawyer, and Mr. Rose has said, I'm just going to tell the truth

25   anyway.  So no harm, no foul, right?

1         MR. DUFFY:  Well, this concept, Your Honor, of this

2    Chinese wall, or I don't want to use the inappropriate term, the

3    prophylactic measures --

4         THE COURT:  Well, having been to the wall in China, I

5    don't think -- we've become so politically correct that we can't

6    even say a wall.

7         MR. DUFFY:  There is --

8         THE COURT:  It was a wall that worked its way

9    appropriately -- see how court reporter looked at you?  You

10   interrupted, see?

11        MR. DUFFY:  There is no case law support for that

12   whatsoever, none.

13        So for example, in both Henry and in Ross, the Court

14   says that this is insurmountable conflict.  It's not a judgment

15   call issue.  It's insurmountable.

16        THE COURT:  No balancing test.

17        MR. DUFFY:  There is a balancing, but when you have a

18   concept of a dual representation, that's when you can't.

19        See, I think the entire framing that you've heard, if

20   you will, from Mr. Schneider defense camp is former client,

21   former client, former client; and the problem with that is that

22   it wasn't a former client until they realized, it had to be a

23   former client and then they switched gears.

24        THE COURT:  What period of time was that, at the

25   arraignment?

Motion to Disqualfy Counsel

```
 1            MR. DUFFY:  It's at some period leading up to the
 2   filing of the notice.  We don't know when the engagement
 3   occurred.  From the Government's side, we don't know when the
 4   engagement with the Marcus Neiman firm --
 5            THE COURT:  And the reason for that you would say, it's
 6   just money.
 7            MR. DUFFY:  I don't know.
 8            THE COURT:  What else would it be?
 9            MR. DUFFY:  I don't know, but what I can say is that
10   Mr. Pineiro continued to represent Mr. Rose.  In fact,
11   Mr. Pineiro told me leading up to the Rule 35 Motion, that he
12   would represent Mr. Rose through trial because our 35 motion was
13   based on that potential testimony and frankly the individual's
14   age and so forth.  So that's why we did it.
15            THE COURT:  I got it.  I got it.  We've got a mess.
16   Don't we have a mess?
17            MR. RASHBAUM:  Judge, may I just comment on Ross
18   quickly?
19            THE COURT:  Sure.
20            MR. RASHBAUM:  In Ross, it was same exact attorney
21   representing both defendants, so it was Neiman representing both
22   Mr. Rose and Mr. Schneider.
23            THE COURT:  But see, the problem with that is -- and I
24   understand that physically, if you have two human beings, it
25   kind of looks a little bit better probably in front of the jury
```

1  but legally -- maybe that's the reason that maybe some law firms

2  have where everybody is separate, the money is separate, they

3  share offices.  I don't want to tell you all how to do things,

4  because I didn't do that a long time ago when there were a lot

5  of conflicts and the conflicts were resolved.

6          You know how we used to resolve conflicts?  You call

7  your friend.  You give him, your client, a list of half a dozen

8  other lawyers, and then they bring you in, you bring them in,

9  and life goes on because there are enough good lawyers.

10         It's really unseemly in this case because the prior

11  client's representation seems to preclude the co-conspirator's

12  alleged representation, doesn't it --

13         MR. RASHBAUM:  I don't think so, Your Honor.

14         THE COURT:  -- because of being in the same firm?

15         See, if they weren't in the same firm, we wouldn't be

16  having this conversation, whether you erect a Chinese wall or a

17  computer where they don't let you have access to whatever is

18  there.  It's a problem, but a problem that you kind of suffer

19  the consequences of who you represent, and this must happen all

20  the time, right?  This is a long investigation, I presume,

21  right?  Right?

22         MR. BROWNE:  Yes.

23         THE COURT:  Someone has to say something.

24         So if it's a long investigation, many times lawyers get

25  involved in good faith, they represent someone and they say,

1   okay, you're the chief executive officer, you're the

2   vice-president, who gets what?  And a lawyer says, well, I want

3   to get the top dog because that's the one I want to represent

4   and then I'm going to get a higher fee.  Okay.  If someone

5   decides to represent someone else, you kind of have been

6   precluded from representing the top dog, right?  Doesn't that

7   make sense?

8          MR. RASHBAUM:  Judge, the rule doesn't preclude that.

9          If I could just finish, under Ross, which they're

10  touting Ross for you to look at, so you have to look at what the

11  Eleventh Circuit said in Ross and what they considered.

12         Under Ross, there was no independent co-counsel for

13  cross-examination.  That was important to the Eleventh Circuit.

14  It was important to the Eleventh Circuit that Mr. Neiman didn't

15  represent both.  It was important to the Eleventh Circuit that

16  there was no screening procedures in Ross, which there are here.

17  It was important in Ross, and the Eleventh Circuit thought it

18  was important, that there was no waiver from the

19  defendant/witness.  There's a waiver here.  And it was important

20  in Ross that he was a former client -- not a former client in

21  Ross, it was a current client.  So those are very big

22  differences.

23         THE COURT:  What do I do with those distinctions?

24         MR. BROWNE:  I don't think Ross says any of those

25  things.  I don't know if -- I honestly do not know, but there is

1  no discussion of prophylactic measures and what would be

2  sufficient, what would be insufficient in Ross itself, and there

3  were three different lawyers named in Ross.  It's Weinstein --

4        MR. DUFFY:  Weinberg.

5        MR. BROWNE:  Weinberg.  I mean, there are literally

6  three lawyers involved, and one of the lawyers had no

7  involvement at all with the prior client, but guess what?  He

8  gets disqualified because he's in the same firm.  That's what

9  actually happened in Ross, but the Court can read the case for

10  itself, but the key in Ross is that it talks about precisely the

11  situation, what happens when a law firm represents a witness and

12  then comes in and tries to represent the defendant against whom

13  that witness will testify.  It's an insurmountable conflict for

14  a good reason, the facts being what they are.

15        THE COURT:  But if the facts of the Ross case are as

16  the defense makes it out to be, it makes this a weaker case than

17  Ross, agreed?

18        MR. BROWNE:  I actually think that the Ross case, if

19  the Court reads it, will focus importantly on the fact that the

20  attorney who sought to represent Ross, the defendant in that

21  case, got paid money by the co-conspirator witness who was not a

22  codefendant.  A co-conspirator in another case got paid money.

23  That was really important, a $40,000 fee.  That's something the

24  Court really focused in on and Mr. --

25        THE COURT:  You think I'm avoiding the money issue.

1        MR. BROWNE:  Mr. Rashbaum got paid by Mr. Rose.  That's

2   not in dispute here.  That's the way their firm works, and

3   there's nothing wrong with that on its face, but if you try to

4   represent both, it is a problem.  He got paid by Mr. Rose.

5        THE COURT:  You know that.

6        MR. BROWNE:  Well, he hasn't disputed it yet, Judge,

7   and most of the things that come out of my mouth that are

8   wrong --

9        THE COURT:  Your investigation hasn't -- I mean, do you

10  know that?

11       MR. BROWNE:  We're not going to investigate the

12  finances of their firm, but I believe Mr. Rashbaum will concede

13  it.

14       THE COURT:  The money.  We were at the thing that I

15  always want to avoid.

16       MR. RASHBAUM:  Look, I think --

17       THE COURT:  We've got to talk --

18       MR. RASHBAUM:  Look, I think --

19       THE COURT:  You all interrupt.  You make the court

20  reporter --

21       MR. RASHBAUM:  Sorry.

22       THE COURT:  She's going to go on strike unless you want

23  to waive a court reporter.  We probably shouldn't in this case

24  and others maybe.

25       Okay.  We've got to get into the money thing, huh?

1        MR. RASHBAUM:  I don't think it matters under the law,

2   but the answer is I'm sure that I got paid some under Sheldon

3   Rose's representation with how our firm works.

4        THE COURT:  Of course.

5        MR. RASHBAUM:  Yeah, I'm sure I did.  I can't tell how

6   much, because I don't know and I can't tell you, you know -- but

7   the way our firm works, some of that money of his representation

8   would have flowed to me.

9        THE COURT:  Of course, unless you're all independent of

10  each other, and even that maybe.

11       MR. RASHBAUM:  But it's irrelevant under the law.

12       THE COURT:  Well, I don't know if it's irrelevant.  I'm

13  not as concerned about it as the prosecutor is, but the problem

14  with all these, not that many cases but the problem with these

15  cases is, the appellate judges consider every little thing, see,

16  which is why you all have been more careful by having

17  independent counsel, by having all of that.  Obviously, it's a

18  reaction.

19       Things are a lot better than they were in the '80s when

20  nobody cared and you all were too young to know that, but it was

21  just a free-for-all with a lot of ethical issues.

22       I'm not going to rule from the bench, so you don't have

23  to worry about it, because you all probably didn't expect me to

24  bring you in so quickly, expecting objections which you have the

25  right to object to.  I just wanted to get first the actual

1    waiver from Mr. Schneider.  I still have to do it with Rose and

2    I have to think about this.  We have an August trial date.

3              You're going to be ready?

4              MR. BROWNE:  The Government is going to be ready, Your

5    Honor.

6              The only thing we would ask is for a little bit extra

7    time to file our objections based on what Mr. Rose says when he

8    actually comes to court.

9              THE COURT:  We don't know when he's coming to court.

10   He's getting out at the end of July.

11             MR. BROWNE:  Okay.  We'll file our objections --

12             THE COURT:  See, I'm not going to force him.  How do

13   you want me to get him here?  We don't even have his lawyer

14   here, right?

15             MR. PINEIRO:  No, Your Honor.

16             THE COURT:  Okay.  What a mess?

17             You wanted to say something.

18             MR. PINEIRO:  Please, Your Honor.

19             I'm not sure if it would be of assistance to the Court,

20   but there have been representations made in court regarding how

21   pivotal Mr. Rose's testimony is in this case.  I am not going to

22   judge one way or another whether he's a key witness or more of a

23   tangential witness.  I do have notes of the debriefs.  I do have

24   notes of my phone call and I can go sidebar with the Court and

25   provide you with that information to the extent that you think

1  it's useful.  I have it.  It's available to me.

2       I'll say I don't entirely agree with the Government's

3  representation, but again, that was my understanding of how they

4  were going to use Mr. Rose.

5       THE COURT:  Well, I think a possible solution or at

6  least a step towards a solution with this dilemma is Mr. Rose

7  has to be here.  I've got to make sure he understands what we're

8  talking about regarding privileged communications before we even

9  get to the wall issue and maybe find out -- He testified in

10 front of the grand jury?

11      MR. DUFFY:  No, Your Honor.

12      THE COURT:  Because what I was thinking is maybe we

13 should hear what he has to say.  I'm sure the defense would like

14 that.

15      MR. BROWNE:  I'm sure they would love a chance to

16 depose the Government witness, Your Honor, and that's, again,

17 just another problem.

18      THE COURT:  Yeah, it is a problem.  I'm looking for

19 solutions, folks, in this type of thing.

20      Normally, we can't make everyone happy, but whenever we

21 have to conduct a balancing test, it's tough because no matter

22 what we do here, there's going to be an issue on appeal.  I hate

23 having issues on appeal before we even pick a jury.  It's just

24 uncomfort.

25      MR. BROWNE:  It is and it's uncomfortable for the

1   Government.

2          At the end of the day, we're required to file this

3   motion.  The ethics rules require us to raise this conflict.

4          THE COURT:  I'm not blaming you for filing the motion.

5   I'm not blaming you, and they've gone up the chain.  I think the

6   solution is simple without Court interference.  Sorkin

7   represents him and that takes care of it and all the associates

8   that Sorkin has.

9          MR. RASHBAUM:  It's great that the U.S. Attorney's

10  Office doesn't want Marcus, Neiman and Rashbaum, Dan Rashbaum to

11  represent him at trial.

12         THE COURT:  I don't think -- You think it's personal?

13         MR. RASHBAUM:  Of course, it's personal.  They know how

14  I try cases.  They know I'm not afraid of them.  Of course, it's

15  personal.

16         THE COURT:  You really think so --

17         MR. RASHBAUM:  Yes.

18         THE COURT:  -- that that's the reason they do it?

19         MR. RASHBAUM:  Yes, Your Honor.

20         THE COURT:  Because you think you're the biggest

21  fighter --

22         MR. RASHBAUM:  I don't.

23         THE COURT:  -- in the Southern District of Florida.

24  You interrupt a lot and maybe that's why I wouldn't want you

25  here, but that nothing has to do with it.  I'm kidding with

1   that, not that you interrupt a lot.  But there are so many

2   lawyers, you know.  I know criminal defense lawyers, they all

3   think they're the best, and just because you're good, doesn't

4   mean you're the only good one.

5           MR. RASHBAUM:  I would never --

6           THE COURT:  It just resolves the problem.  There's no

7   issue.  It's a clean trial.

8           MR. RASHBAUM:  Mr. Schneider gets to pick his lawyer.

9           THE COURT:  And the reason I'm saying all of this --

10          MR. RASHBAUM:  He gets to pick his lawyer to fight for

11   his life and he gets to make --

12          THE COURT:  Unless there's an absolute conflict.

13          MR. RASHBAUM:  Which there isn't here.  And he gets to

14   make the choice of who's going to fight for him.

15          I've never said I'm the best lawyer, I've never even

16   said I'm good lawyer.  I just said that Mr. Schneider gets to

17   make the choice under the Sixth Amendment.

18          THE COURT:  But you've said the reason the prosecutors

19   want to do this is to get you out of the case.

20          MR. RASHBAUM:  They do.  They do.

21          THE COURT:  Because you don't think you could be

22   replaced by someone that they may regret.

23          MR. RASHBAUM:  I didn't say that, Your Honor.  I just

24   said it's clear based on the misrepresentations that they make

25   about things that I said, that it's clear that they don't want

1  me in the case.

2          THE COURT:  But for personal reasons.

3          MR. RASHBAUM:  I have no idea.  I don't work at the

4  Government.

5          THE COURT:  But you used to.

6          MR. RASHBAUM:  And I'll tell you the same thing I would

7  tell you back then.  The fact that the supervisors say certain

8  things mean very little to me.  The law says what the law says.

9          THE COURT:  I was never an assistant U.S. attorney but

10  I know that all the former assistant U.S. attorneys say that it

11  was just a honorable thing, and you always wanted to do the

12  right thing.  You can fight hard, and of course, it's very

13  honorable to be a criminal defense lawyer.  I was one of them,

14  but whenever there's a conflict, I just think it's time to shy

15  away from it.  It's the defendant's right.

16          What do you think after all this discussion?  You're

17  still of the same mind, Mr. Schneider?

18          THE DEFENDANT:  Your Honor, yes.

19          THE COURT:  I don't want you to talk about the case,

20  but just the about these conflicts.  What do you think?  I know

21  you've thought about this and the fact that you're a lawyer and

22  I know nothing about your case because maybe I don't want to

23  know anything about the case or anything until the time comes.

24  It just makes it easier for me and it resolves the issue and the

25  lawyers can give whatever they have to the new lawyer.  You

1    start again.

2          If there's more time that is needed, more time is

3    given.  There's no issue as to that.

4          Why do you think that it's so important to have the

5    same law firm that represented, at one point or another, a

6    cooperator who's going to testify against you?

7          THE DEFENDANT:  Well, I could honestly say, I really

8    don't think that Mr. Rose has a dog in my fight.  We haven't

9    gone into the details, but I have no relationship with Mr. Rose

10   that I can ever recall in 48 years of practice.  I've looked at

11   time sheets.  I've looked at --

12         THE COURT:  Well, I don't want you to talk about the

13   case.

14         THE DEFENDANT:  Yeah, I know.  I understand.

15         THE COURT:  I don't mean to say that you're saying

16   anything wrong.

17         THE DEFENDANT:  I'm saying I don't think he really has

18   a major issue in my case.  For whatever reason, maybe we haven't

19   had information from any other sources.

20         THE COURT:  Well, see?  See?  Wouldn't it be better --

21   I know prosecutors, of course, in Federal court don't want to

22   disclose everything, but perhaps in this unusual case, knowing

23   exactly what Mr. Rose has to say, which I know it's a

24   disadvantage for the Government in Federal court because then

25   the defendant knows what he says, but if it's true that Mr. Rose

Motion to Disqualify Counsel

1  is going to stick to what he says and is telling the truth,

2  according to the Government, and if he were to say that here in

3  open court in front of -- that's why I asked if he had testified

4  before the grand jury.  You would have to disclose that anyway.

5  Then the defendant finds out what he says and then the defendant

6  himself, Schneider, could say, you know, now that I think about

7  it, I would prefer another lawyer.  That could happen, couldn't

8  it?

9       MR. BROWNE:  It could.  It would also be an

10  advantage --

11       THE COURT:  No question about it.

12       MR. BROWNE:  -- occasioned on Mr. Rashbaum's firm by

13  virtue of their conflict.

14       THE COURT:  So you think from now on, he's going to

15  seek conflicted cases if they're assigned to Judge Moreno, and

16  therefore, get the other clients.

17       MR. BROWNE:  What was the last --

18       THE COURT:  Are you people going to do that?  Come on,

19  folks.  There's such a little statistical chance of these things

20  happening like that.

21       I think you all ascribe, not bad faith, but you ascribe

22  to too much manipulation.

23       MR. BROWNE:  Oh, no, we're not --

24       THE COURT:  They think you're manipulating and you want

25  him out because he's going to be a pain in your neck.

1          MR. BROWNE:  Could I address that?

2          THE COURT:  You're not going to be a pain in his neck?

3          MR. BROWNE:  Mr. Duffy nor I have ever had a case with

4  Mr. Rashbaum, never.

5          I had my first meeting with Mr. Rashbaum last week on

6  another case.  I've never actually tried a case against him,

7  I've never had a matter where he represented anybody.

8          THE COURT:  But why would it be personal?

9          MR. RASHBAUM:  I didn't say it was personal from them.

10          THE COURT:  Just business.

11          MR. RASHBAUM:  I didn't say personally from them.  I

12  said I don't attribute -- I follow the Eleventh Circuit law.  I

13  don't follow the law of the supervisors of the U.S. Attorney's

14  Office.

15          I mean, this is a waivable conflict.  The Eleventh

16  Circuit is clear on that.

17          THE COURT:  All right.  Well, if it was so clear, you

18  all wouldn't be citing to the same case.  You have to cite to

19  that case, because I have to follow it, but there are probably

20  distinctions between that case and this one and maybe we have to

21  look at the record of that case.

22          MR. RASHBAUM:  That's what we did, Your Honor.

23          THE COURT:  The district court record of the case.  Who

24  was the assigned judge?

25          MR. BROWNE:  Of which case, Your Honor, Ross?

1      THE COURT:  Yes.

2      MR. BROWNE:  The district court judge, I do not know.

3      THE COURT:  Do you know?

4      MR. RASHBAUM:  It's an old case.  I did look at the

5  record.

6      THE COURT:  That's okay.  I'm an old judge.

7      MR. RASHBAUM:  Do you remember who it was?

8      MS. GREEN:  I don't.

9      Your Honor, I don't remember who the judge is, but

10  there are no ECF records.  I think it's from the early '90s.

11      THE COURT:  So am I.  So that's okay.

12      MS. GREEN:  I don't have available to me, nor do we,

13  you know, within our capabilities at the firm.  I don't have

14  access --

15      THE COURT:  Here in the Southern District of Florida,

16  right?

17      MR. BROWNE:  Northern District of Florida.  If the

18  Court can remember initials of Judge MMP.  That's Mitchell Paul?

19      MR. DUFFY:  Judge Paul.

20      THE COURT:  Maurice Paul who's no longer with us.  It's

21  Middle District of Florida.

22      MR. BROWNE:  Well, that's the district court judge.

23      THE COURT:  Northern District I think.

24      MR. BROWNE:  Northern district, correct.

25      THE COURT:  Correct, it was northern, but you know,

1    yeah, he's no longer with us.

2            What did you check?

3            MS. GREEN:  I checked when I drafting the --

4            THE COURT:  Here, is it easier for you to come here so

5    that way you're not bending?

6            MS. GREEN:  I think so, probably.

7            I checked when I was drafting the response to the

8    Government's disqualification motion.  The docket is available

9    online.  However, the actual records, the --

10           THE COURT:  They're in a vault in Atlanta.

11           MS. GREEN:  I'm sure they're in a vault somewhere in

12   paper form, but I did not have time to access those.

13           THE COURT:  All right.  Would that help me?

14           MR. BROWNE:  Actually, Judge, I mean, there has been so

15   much discussion about Ross.  One thing Mr. Rashbaum said is Ross

16   involved the same lawyer.  That's not true.  There were three

17   lawyers actually named in Ross.  All of them worked for the same

18   firm.

19           The fact is that there the cooperator was named Aspuru.

20   He had had a meeting with one of the attorneys who was going to

21   represent Ross and he paid $40,000 --

22           THE COURT:  Yeah, you told me.

23           MR. BROWNE:  -- as a retainer to that attorney and

24   that's one of the attorneys that the Eleventh Circuit

25   disqualified from the case, but they just didn't disqualify that

1  attorney.

2       THE COURT:  Okay.  Do you think I should know how much

3  money was paid here?

4       MR. BROWNE:  I think you can stop right with the fact

5  that Mr. Rashbaum admits that he got paid by Mr. Rose.

6       THE COURT:  Doesn't matter how much.

7       MR. BROWNE:  I don't know.  I don't know if Ms. Green

8  got paid.  It's not just Mr. Rashbaum obviously.  Ms. Green is

9  going contribute in this matter, too.  I don't know that

10 Ms. Green got paid, because I don't know if she's a partner, but

11 I don't know if the amount of money makes a difference.  The

12 fact that --

13      THE COURT:  Well, the way you say $40,000, it seems

14 like it does to you.

15      MR. BROWNE:  No, that just happens to be the amount

16 that was discussed in the Ross opinion and they focused on the

17 fact that the lawyer who sought to represent Ross --

18      THE COURT:  I started the hearing by saying I didn't

19 think the money was that much of a big deal.

20      MR. BROWNE:  But the Eleventh Circuit --

21      THE COURT:  Says it is.

22      MR. BROWNE:  -- says it's important, yeah.

23      THE COURT:  That's a fact.

24      MR. BROWNE:  It's actually one of the two rationales

25 that they base their decision on.

Motion to Disqualify Counsel

1        THE COURT:  All right.  Okay.  Let me think about it.

2        What other the issues are we going to have in this

3   case?  How long of a trial is it?

4        MR. BROWNE:  Your Honor, we think, given how you run --

5        THE COURT:  It would be a perfect case for new judge to

6   do.

7        MR. BROWNE:  Given how you run your courtroom, Your

8   Honor, we think approximately two weeks --

9        THE COURT:  What do you think?

10       MR. BROWNE:  -- two full weeks, depending on what you

11  do and don't allow.

12       THE COURT:  I don't know anything about the case,

13  except what I've read so far.

14       How long do you think it's going to take?

15       MR. RASHBAUM:  I'm not really sure, Your Honor.

16       THE COURT:  An estimate.

17       MR. RASHBAUM:  Mr. Sorkin would probably be the better

18  person to ask.

19       THE COURT:  Maybe I should have him come down.

20       MR. RASHBAUM:  He's willing to come down if you need

21  him to.

22       MR. DUFFY:  Your Honor, if you think about this issue,

23  we would just like to leave you with one other case.  I know

24  you're going to look at these cases as you've said.

25       THE COURT:  Well, I'm going to let you do what you

1    normally do.

2          MR. DUFFY:  Okay.

3          THE COURT:  You can object to the Report and

4    Recommendation, both sides.  You can respond to each other's

5    objections if you don't like something that she did, Judge

6    Louis.  You can file a Motion for Reconsideration, and I'm not

7    going to make a ruling until all of that is done.

8          What we have though is that we're in June.  July is

9    right around the corner and then comes August.  That's why I'm

10   asking these questions.  But obviously, it's not the only case I

11   have set for August.  You all know that.

12         MR. DUFFY:  Your Honor, also one issue has come up

13   today that I want to make we don't leave with you a

14   misimpression.  We put in our Motion to Disqualify, we put a

15   description of how Mr. Rose and Mr. Schneider intersect, how

16   they factually intersect in the case.

17         We had not said that Mr. Rose is the most important

18   Government witness.  We do not want to leave you with the

19   impression that Mr. Rose will bury Mr. Schneider.

20         We do want to leave you with the impression, as we did

21   in our papers, that, for example, Mr. Rose was on paper a client

22   of Mr. Schneider, that Mr. Rose was paid by Mr. Schneider, that

23   there was supposedly an attorney/client relationship and the

24   nature of that relationship is part of the scheme to defraud

25   that's alleged in the Indictment along with other supposed

1  clients.

2        THE COURT:  All right.

3        MR. DUFFY:  So I just want to -- I don't want to leave

4  you with a misimpression.

5        THE COURT:  All right.  No problem.  No problem.

6        I probably exaggerate when I put something

7  intentionally and I'm the one who used the word "bury" and

8  things like that, not you all.  You all are more eloquent

9  anyway, but it's to make a point, does that make any difference,

10  it probably doesn't.

11        For that matter, since everybody knows what he says,

12  there may really be no handicap to him telling us what he said

13  in advance of trial.

14        MR. DUFFY:  An awkward facet of this circumstance is

15  that before we learned that Marcus Neiman Rashbaum was entering

16  an appearance for Mr. Schneider, the reason we were having the

17  dialogue with Mr. Pineiro is because we were trying to arrange a

18  meeting and in fact --

19        THE COURT:  Well, why don't you call Fasano?

20        MR. DUFFY:  Well, we, of course, will, but the issue is

21  that we consider the payment that was made to Mr. Fasano as a

22  problem, because Mr. Rose was supposed to get $2.4 million to

23  the United States Treasury and he hasn't done that and so if

24  he's paying bills --

25        THE COURT:  That's a separate thing.

1          MR. DUFFY:  It is but --

2          THE COURT:  I don't have authority to do anything about

3    that.

4          MR. DUFFY:  It's relevant to this motion but it creates

5    an awkwardness with the new lawyer who was selected by the last

6    lawyers and paid by the last lawyer.

7          THE COURT:  Hold on a second.

8          First of all, you can talk to Mr. Fasano.  He should be

9    made aware, and I probably made a mistake in not bringing him in

10   here, so that was my mistake, because he's here in Miami.  You

11   might as well hear what he had to say, and I kind of dropped the

12   ball in that sense, but we'll bring him in.  But you certainly

13   have no -- there's no bar for you calling Mr. Fasano because

14   that's the only way you can actually contact someone who's

15   represented.

16         MR. DUFFY:  Yes, Your Honor.

17         THE COURT:  And then he can tell you, I don't

18   represent.

19         Now, as far as money that has been paid to him, you

20   deal with it like you do with any other lawyer where money has

21   been paid.  I assume that you tell some lawyers, hey, listen,

22   we're going to try to seize your fee or freeze it or do

23   something, but then you're opening up a whole can of worms.  It

24   may not even be that much money, not that the number of dollars

25   makes a different, but he should be aware of this issue that you

1  all have if that's what you want to do in front of Judge

2  Martinez on a closed case with a witness who's still willing to

3  testify.  It seems like it probably is not worthy of that.

4           MR. DUFFY:  No.

5           THE COURT:  But I'm not a prosecutor, so I don't know

6  how you all think.

7           So who pays, does it really make any difference?

8  Remember my example an hour ago had to do with father for a son,

9  it doesn't matter who pays as long as the lawyer is truly

10  independent, fighting for his client, right?

11          MR. DUFFY:  Well, in these circumstances, Your Honor,

12  it does matter.

13          THE COURT:  Why?

14          MR. DUFFY:  Because the day of the arraignment, where

15  Mr. Rashbaum enters his appearance or appears at the arraignment

16  of the Superseding Indictment, we're told that afternoon by

17  Mr. Pineiro that they were going to represent him pro bono.

18          THE COURT:  Yeah, you told me.

19          MR. DUFFY:  I'm sorry, I didn't finish my sentence.  I

20  don't mean to interrupt, Your Honor, but that there would be a

21  waiver coming to us forthwith, soon.  You'll get written waiver.

22  Okay?

23          THE COURT:  From Rose.

24          MR. DUFFY:  Of Rose.  We waited to get the written

25  waiver.  We wanted to see it.  We ultimately filed a motion

1  within two weeks.  We filed our motion.  Later that same day, we

2  get this written waiver sent over to us by email.

3          It appears that there was no independent, conflict-free

4  counsel who talked with Mr. Rose before he signed the waiver and

5  it appears --

6          THE COURT:  How do you know that?

7          MR. DUFFY:  Well, because it doesn't look like Mr. --

8          THE COURT:  Why isn't Fasano independent?

9          MR. DUFFY:  It doesn't look like Mr. Fasano got brought

10 into the case before the written waiver was signed, and so then

11 what it appears from what we now know because Mr. Rose initially

12 refused to answer the question in the telephone hearing with

13 Judge Louis when he's asked who's paying him, he refused to

14 answer.

15         THE COURT:  That's when he talked about the credit.

16         MR. DUFFY:  Yes, it's my understanding.  I was sick and

17 read the transcript.

18         THE COURT:  I mean, I don't know.

19         MR. DUFFY:  So it's an unusual situation and it's

20 intertwined with the voluntariness of the waiver and --

21         THE COURT:  But that I can deal with, with Rose.

22         MR. DUFFY:  Potentially.

23         THE COURT:  Bring Rose, bring Fasano.  You want Fasano?

24 I suspect that even here in open court without a microphone

25 problem, he's going to understand how I talk and he's going to

1   understand and he's going to be happy with Fasano even though he

2   liked Mr. Pineiro and others, right?

3           So what difference does it make?

4           MR. DUFFY:  Well, the difference is this --

5           THE COURT:  If he says that, if comes in and says, hey,

6   they want me to testify, I'm ready to testify.  Hey, Fasano, I

7   like.  As long as I don't have to pay any money, I have some

8   credit.  He hasn't sought to get his money back, has he?

9           I don't know who to look at.

10          MR. RASHBAUM:  When it's any questions about Mr. Rose,

11  it's not me.

12          THE COURT:  I got it, I got it, but I don't know if you

13  can --

14          MR. RASHBAUM:  I'm just telling you I don't know any

15  facts.  I don't know the facts.

16          MR. NEIMAN:  He hasn't, Your Honor.  There was a flat

17  fee in which the money was paid.

18          THE COURT:  And that's why you said, he thinks it's a

19  credit, and you say, you know what?  I'm a good guy.  You paid

20  for me.  We're in it for life.  No matter what.

21          MR. NEIMAN:  It's an expense that we deemed should be

22  paid, that's it.

23          THE COURT:  All right.  You can't accept that?

24          People do that sometimes.  You get enough money and you

25  say, I'll stay in the case.  It's a pain in the neck, but I'll

1  stay in the case anyway, but now there's a conflict, so I'm out.

2  So how does Fasano get paid?

3       MR. NEIMAN:  We're going to pay him with the money that

4  was paid from the flat fee.  So, Your Honor, I think --

5       THE COURT:  So it's an unusual thing in the sense that

6  the same firm, you're actually reducing --

7       MR. NEIMAN:  We are going to make less money on the

8  representation, yes, but --

9       THE COURT:  Well, you made the money some time ago I

10  suspect.

11       MR. NEIMAN:  But look, I think Your Honor is exactly

12  right in that it's Mr. Rose who if he unequivocally says, even

13  after hearing all this and the ifs and the buts and the maybes

14  and all that could happen to him and that dooms day may be here

15  or he may be in paradise, once he hears everything, knowing that

16  there are privileged communications that have been delivered to

17  the law firm, that he's still okay with this, as a former

18  client, he can waive it, and if he's ironclad with that as the

19  Court determines, then sobeit.

20       THE COURT:  Your opponents say we've got to do more

21  than that.  It's dual representation, it's not waivable, and

22  that's really the issue, isn't it?  Right?

23       MR. DUFFY:  That and the irrebuttable presumption the

24  Eleventh Circuit has on the exchange of confidential

25  information.

 1          THE COURT:  Wouldn't it be great if we could get a

 2  ruling before trial from the Eleventh Circuit?  Have your legal

 3  eagles in your office figured that out?  Because it happens

 4  every once in awhile.

 5          Isn't it better than going through a two-week trial and

 6  having appeals and harmless error and 2255?  They don't give

 7  advisory opinions but wow --

 8          MR. DUFFY:  If you're inclined to certified the

 9  question, that might be something we could discuss with our

10  appeals.  I don't know if it's something that can be certified.

11          THE COURT:  I don't know if you could certify a

12  question in criminal cases.  What do you think?

13          MR. RASHBAUM:  Judge, I have an idea.  And I would

14  agree for him to be interviewed, Mr. Rose -- I mean, you have to

15  talk to his lawyer -- ex parte without our participation, so you

16  could hear what he'd have to say at trial.

17          THE COURT:  How about that?

18          MR. RASHBAUM:  Then you don't risk me learning any

19  unfair advantage.

20          THE COURT:  How about that?

21          MR. RASHBAUM:  You could hear about what he had to

22  testify to.

23          MR. DUFFY:  Your Honor --

24          THE COURT:  That's like testifying in front of a grand

25  jury.

1          MR. DUFFY:  Right, Your Honor, but one of the things

2     that --

3          THE COURT:  I've never been in a grand jury.  I'm not

4     looking forward to it but --

5          MR. RASHBAUM:  I'm giving you ideas.  I mean, I'm not

6     looking for an unfair advantage.

7          THE COURT:  Well, you're looking for an advantage, too,

8     but not in this case with this issue.

9          MR. DUFFY:  That would put us at some something of a

10    disadvantage.

11         THE COURT:  Why?  That way you know how he is and

12    you'll probably know how he is when he gets cross-examined by

13    me.

14         MR. DUFFY:  Yes, sir, Your Honor but we --

15         THE COURT:  Oh, see, I think that's actually a

16    reasonable thing from your opponent.

17         MR. DUFFY:  All right.  Your Honor, look I think --

18         THE COURT:  But you want to talk to him before I talk

19    to him.

20         MR. DUFFY:  Well, that is one issue.

21         THE COURT:  You could do that by calling Mr. Fasano,

22    and when he gets out in July, you go up to Orlando or he comes

23    down, you pay his way.  I don't know what his finances are.

24         MR. DUFFY:  The other issue, too, you put your finger

25    on it earlier, is that, what if Mr. Rose changes his mind?

 1          THE COURT:  Is this your second hearing, Shirley, that

 2  you've done with this firm that has interfered with my lunch?

 3          Go ahead.

 4          MR. DUFFY:  There's nothing that stops Mr. Rose

 5  changing his mind.

 6          THE COURT:  Well, let's find out.

 7          MR. DUFFY:  Right, but the problem is that, is that

 8  then you all of a sudden have lawyers with confidential

 9  information who are cross-examining him.

10          THE COURT:  Well, first of all, when will they

11  cross-examine him?  If he changes his mind about the testimony

12  or about testifying?

13          MR. DUFFY:  Well, frankly, about the testimony -- I

14  mean, about the waiver.  You said a moment ago, you said a

15  moment ago earlier in the hearing --

16          THE COURT:  If he doesn't waive, you win this issue.

17          MR. RASHBAUM:  True.

18          THE COURT:  True?  True?  That's an easy one your

19  opponent says true.

20          MR. DUFFY:  Yes, yes, if it's not a dual

21  representation.

22          THE COURT:  So if he comes in and says, well, now that

23  you've explained it to me, I'm not waiving anything except

24  good-bye and then he does that, in comes Sorkin and whoever

25  wants.  The finances you all deal with who got paid with what,

1   none of my business, good-bye, and that is what the Government

2   would prefer, right?

3           MR. DUFFY:  We would prefer --

4           THE COURT:  But the only way to do that is to hear from

5   Rose personally.  I can't do it by phone.  I've got to see him.

6           MR. DUFFY:  And you know, this is another issue which,

7   of course, we'll address in our objections, but the Court and

8   the Government and the public have an interest in not only

9   conflict-free trials but the appearance of conflict-free trials,

10  yes.  The problem is --

11          THE COURT:  I don't know.  I don't know how that

12  balances out with the Sixth Amendment.  I don't know.

13          MR. BROWNE:  Well, the Court actually addresses it in

14  Ross --

15          THE COURT:  I know.  I know.

16          MR. DUFFY:  -- and Henry and Butterworth.

17          THE COURT:  I know.  I know.  But I want to hear from

18  Rose.

19          So that means we've got to pick a date in August, close

20  to the trial date, which means we're not going to go to trial in

21  August, right?

22          MR. RASHBAUM:  Yeah.

23          THE COURT:  I mean, I hate to be a realist in June

24  about August because I like to play poker with you all in trial

25  dates when I have more cards than you do, but that's the truth.

 1  It's too complicated to try to resolve this before the man gets

 2  out of his residential --

 3          MR. BROWNE:  Reentry center.

 4          THE COURT:  Reentry.  He lives in South Florida?

 5          MR. BROWNE:  Sarasota.

 6          MR. NEIMAN:  Sarasota.

 7          THE COURT:  Beautiful place.

 8          So we've got to wait till then.  So that means until I

 9  hear from him, I cannot make a decision.  You all can brief the

10  matter however you want.  Maybe I made mistake in sending it to

11  the magistrate because she had to struggle through that.  I

12  thought it was the easier thing to do for me at that point, but

13  I think it's helpful because I know a lot more.  Whether I agree

14  or disagree with the magistrate, we'll find out after you brief

15  it.

16          So you want to brief it or do you want to wait till

17  Rose testifies?

18          MR. BROWNE:  We would brief it first, and we would just

19  ask leave if something comes out obviously.

20          THE COURT:  And defense Rashbaum, do you agree with

21  that?

22          MR. RASHBAUM:  I'm not sure of the question, I'm sorry.

23          THE COURT:  They're going to object to the Report and

24  Recommendation.  You're going to respond.

25          MR. RASHBAUM:  We'll respond, Your Honor, yes.

1      THE COURT:  And then you can reply.  So you do that in

2  whatever time you want, it doesn't matter, because I'm not going

3  to do anything until we get Rose here in August.

4      You're going to call Fasano.

5      You want to talk to your client or with him.  I don't

6  know if he can drive up or however that works.  That's between

7  you and him, whether you want to wait till he gets out -- does

8  he live in Miami?

9      MR. BROWNE:  My understand is he lives in Sarasota.

10      THE COURT:  You told me that, but he has no place in

11  Miami.

12      MR. BROWNE:  We don't think he has any connections --

13      THE COURT:  I think you can go to Sarasota and see him.

14  I think you can do that.

15      Because his wife is from Sarasota.  So you can arrange

16  double things, Mr. Browne.

17      MR. BROWNE:  Your Honor --

18      THE COURT:  If you want to go to Sarasota, you can go

19  to Sarasota.

20      MR. BROWNE:  I like Sarasota very much.

21      THE COURT:  Okay.  So you figure it out and then in

22  August, once you do that, I'll have that information and we'll

23  schedule a hearing when you want in August here.  How's that?

24  Does that make sense to you all?

25      MR. DUFFY:  Yes, sir, Your Honor.  Your Honor, if

1   you're inclined to give us any information about the trial date,

2   we have a lot of moving parts.  We'd be very, very interested to

3   hear your thoughts.

4           THE COURT:  Well, it's not going to be on August 20th.

5   Is that a good thing?

6           MR. DUFFY:  It's fine.  It's just we have so many

7   flying-in witnesses.  That's really what we think about in terms

8   of how -- and schedules, that we just want everyone to be clear.

9           THE COURT:  Fair enough.  We need a conflict-free

10  defense lawyer.

11          MR. DUFFY:  Yes, Your Honor.

12          THE COURT:  You cannot have a trial if there's no

13  defense lawyer.

14          MR. DUFFY:  Yes, Your Honor.

15          THE COURT:  So we've got to deal with that.  It's not

16  going to be in August, but I'll work with you all.  You know,

17  I'll work with you on this type of case because it's a case

18  that's going to go trial, right?

19          MR. RASHBAUM:  We believe so, Your Honor, yes.

20          THE COURT:  Yes.

21          MR. BROWNE:  We believe so.

22          THE COURT:  It doesn't mean that it absolutely has to,

23  but I'll work with you with conflicts because I know my August

24  is pretty busy.  You guys can tell what my August is by looking

25  at other cases that I have.

1      There's a murder case that's set for August, but I

2  suspect the prosecutor is going to ask -- are you involved in

3  that case?

4      MR. BROWNE:  Peripherally as a taint attorney.

5      THE COURT:  Pardon?

6      MR. BROWNE:  As a taint attorney, so I know ---

7      THE COURT:  As a what attorney?

8      MR. BROWNE:  A taint attorney, t-a-i-n-t.

9      THE COURT:  No, I got it.  I'm going to show my

10  ignorance once again.  I don't know what a taint attorney is.

11      MR. BROWNE:  Somebody who's brought in to review

12  potentially privileged or otherwise restricted communications.

13      THE COURT:  Are you specializing in conflict issues or

14  what?

15      MR. BROWNE:  Lucky me, Judge.

16      THE COURT:  Okay.  Well, but that's a murder case,

17  right?

18      MR. BROWNE:  Right.

19      THE COURT:  I'm looking forward to trying a murder

20  case, because it's a different type of case, but I don't know

21  whether they're ready or not, and I don't have the defense

22  lawyer, so I don't want to talk about it.  But I have plenty of

23  cases, so there's no point, and maybe you all will get lucky and

24  the clerk will pick out -- we have a blind random assignment of

25  cases when new judges come in, and I am confident that we'll

Motion to Disqualfy Counsel

1    have two more judges right around August and July.

2        If it does get selected -- I don't pick them, the Clerk

3    of Court picks them, but I will tell you that if you're selected

4    by the Clerk of Court with our automatic thing, I will not be

5    sorry, even though I like you all.  Okay?  No, because if it

6    happens, everything should be random when it comes to that, but

7    there will be two, but the chances are not great because we're

8    supposed to refer Fort Lauderdale cases first and this is a

9    Miami case.

10        But what you should do is -- we're going to have a

11   hearing sometime right before the calendar call, okay, some date

12   before that where I'll have -- by then everything should be

13   briefed.  We'll set a hearing for Mr. Rose to come in.  He can

14   testify.  He at least -- not testify, he can give me the waiver.

15   I can find out from him whether he understands what's going on

16   and then I'll decide whether he should tell me what he would say

17   and the suggestion of the in camera ex parte is a good one.

18   It's no different than testifying I suspect in front of the

19   grand jury.  Since you have a chance to speak with him, you can

20   speak with him regarding both the waiver and the testimony.

21        There's nothing wrong with prosecutors with Mr. Fasano,

22   the new lawyer, talking with him, and then that should help me

23   and we have a full record.

24        Whatever I do, it's got to be a very cautious thing

25   because of what you have raised.  So it's probably going to

1  require written opinion one way or another, so that the wiser

2  judges -- who are the appellate judges?  Maybe they're still

3  around?

4            MR. BROWNE:  On the Ross case?

5            THE COURT:  Yes.  The district judge is no longer

6  around.  Maybe they'll be around and they'll be able to review

7  it, too.

8            MR. BROWNE:  Judge Black.

9            THE COURT:  He's senior.

10           MR. BROWNE:  Johnson.

11           THE COURT:  Pardon?

12           MR. BROWNE:  Johnson.

13           MR. DUFFY:  Senior circuit judge at the time in 1994.

14  Fred Johnson, Senior Circuit Judge, as of 1994.

15           THE COURT:  They are usually three judges.

16           MR. BROWNE:  Yes.  You know, it doesn't say who the

17  concurring judge is, Your Honor.

18           THE COURT:  It stays it at the beginning.

19           MR. BROWNE:  I can hand up the opinion --

20           THE COURT:  Give it to me.

21           MR. BROWNE:  -- but it's a Westlaw printout.

22           THE COURT:  Oh, see.  Well, it doesn't matter.  We are

23  going to follow it no matter what.  Edmondson.  All senior

24  judges.  Okay.

25           MR. BROWNE:  Thank you, Judge.

1    MR. RASHBAUM:  Thank you, Your Honor.

2    THE COURT:  Thank you.  Sorry it took so long.

3    MR. RASHBAUM:  Thank you, Your Honor.

4    MR. PINEIRO:  Thank you, Judge.

5    THE COURT SECURITY OFFICER:  All rise.

6       (The hearing was concluded at 12:30 p.m.)

7

8                 C E R T I F I C A T E

9       I hereby certify that the foregoing is an accurate

10   transcription of proceedings in the above-entitled matter.

11

12   __07-09-18_____           _____
          DATE                    GILDA PASTOR-HERNANDEZ, RPR, FPR
13                                Official United States Court Reporter
                                  Wilkie D. Ferguson Jr. U.S. Courthouse
14                                400 North Miami Avenue, Suite 13-3
                                  Miami, Florida  33128    305.523.5118
15                                gphofficialreporter@gmail.com

16

17

18

19

20

21

22

23

24

25