**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRCT OF FLORIDA**

**CASE NO. 17-20712-CR-MORENO(s)**

**UNITED STATES OF AMERICA**

**v.**

**JAMES M. SCHNEIDER,**

     **Defendant.**

_____/

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America respectfully files this sentencing memorandum to address certain issues to be considered by the Court at sentencing of Defendant James. M. Schneider ("Schneider"). Despite being convicted by a jury of his peers of 33 counts of conspiracy, securities and wire fraud, and money laundering, Defendant not only maintains his innocence, he has repeatedly called into question the validity of the process that led to his prosecution and conviction. On this record, Defendant asks the Court to completely ignore the sentencing guidelines in determining an appropriate sentence, while baldly asserting that "the ultimate issues of guilt and innocence [] will be addressed as part of any potential appeal[]." (Def. Sentencing Mem., at 2 (Dkt. No. 157).)

Having attacked almost every paragraph of the presentence investigation report ("PSI"), the Defendant lied to the Probation Officer during the presentence investigation itself, making it impossible for the Court to know his true financial condition and to avoid having to pay restitution with his existing wealth. The Defendant also repeatedly lied to the jury during his trial testimony, lied to the SEC during his investigative testimony, lied to the SEC, lied to the recipients of

approximately 40 opinion letters, and lied to the investing public via the false SEC filings he drafted and approved.  Defendant also suggests to the Court that his criminal conduct was an aberration from a life of nothing but honesty and integrity.  However, this rampant lying to the Court, the Probation Officer, and the Government over the past four years through today suggests otherwise. These lies place him in stark contrast to all the other defendants that have been sentenced in this shell factory scheme.

The evidence that supports Defendant's conviction – the creation of false and deceitful documents to lend legitimacy to fake companies, fake share ownership, and false classification of shares -- is entirely consistent with the manner in which the Defendant approached his interactions with the SEC during the scheme and the subsequent SEC investigation, his testimony during the trail of this case, and his obstruction of the presentence investigation.  Defendant believes himself to be above reproach and that he makes up the rules.  Defendant continues to believe this entire process to be illegitimate, and he takes no responsibility for his actions whatsoever.  Defendant's sentencing memorandum makes no acknowledgement of his own misconduct during the scheme, or his lack of candor with the SEC, or his ongoing concealment of his financial condition from the Probation Officer to avoid having to pay restitution.  The Defendant therefore stands before the Court in complete defiance of its authority.

It is not surprising, therefore, that Defendant informed the Probation Officer that he owns only $3,000 in one joint checking account and a Toyota automobile.  Defendant's approach to the presentence investigation is similar to his approach to the federal securities laws—the Defendant in his own mind decided that he could lie with impunity on documents, that he himself could decide when he wanted shares to be classified as free trading or restricted, and that he determined what did

and did not need to be included in filings provided to the SEC.  This is what led to his participation in a nearly six-year long criminal scheme that caused millions of dollars in investor losses and spanned 20 separate fraudulent companies.  Defendant's consistent approach before, during and after the trial of this case gives the Court powerful insight into who Defendant really is, and how he came to be involved in criminal conduct.

There are five main factors that set this Defendant apart from the other eleven other defendants who were convicted in connection with the Shell Factory Fraud scheme.[1]  First, Defendant Schneider did not plead guilty, and unlike all of the other defendants this Defendant maintains his innocence (and defiance) to this day.  The Court can have no confidence that the Defendant will conform his behavior to the law since he denies having ever violated the law, and thus considerations of specific and general deterrence apply differently to such a defendant.  Second, Defendant Schneider did not sign a plea agreement and cooperate with the Government by testifying at the trial of a co-defendant or otherwise providing substantial assistance, and thereby receive cooperation credit through a 5K1.1 motion or a Rule 35 motion for reduction of sentence.  In a case of this complexity, spanning so many years and so many fraudulent shell companies, such cooperation is invaluable for the Government to be able to adequately investigate and hold accountable the participants of such a scheme.  Every other defendant cooperated, and all but one cooperated before indictment and were thus charged by information.  Third, Defendant Schneider

---

[1] Eleven other defendants have been convicted in the Southern District of Florida in connection with the Shell Factory Fraud investigation: John Ahearn and Andrew Wilson, Case No. 17-20883-CR-KMW; Yelena Furman, Case No. 17-20713-CR-CMA; David Lubin, Case No. 17-20508-CR-MGC; Sheldon Rose and Ian Kass, Case No. 16-20706-CR-JEM; Steven Sanders and Alvin S. Mirman, Case No. 16-20572-CR-CMA; Daniel McKelvey and Jeffrey Lamson, Case No. 16-20546-CR-RNS; and, Delaney Equity Group LLC, Case No. 18-20336-CR-CMA.  Defendant Myron Gushlak has also been charged but his case was transferred to fugitive status in Case No. 17-20713-CR-CMA.  These convicted defendants included two attorneys who practice securities law (Lubin and Wilson), a registered securities representative (Kass), a stock transfer agent (Ahearn), a securities broker-dealer (Delaney Equity Group LLC), an accountant (Lamson), and five stock promoters (Sanders, McKelvey, Mirman, Rose, and Furman).

repeatedly lied under oath during his trial testimony to avoid accountability and impede the ability of the jury to understand the scheme and his role in it.  This puts Defendant legally and factually into a separate category than the other defendants who provided truthful information to the Government.  Fourth, Defendant Schneider lied to the Probation Officer during his presentence investigation, hiding his assets and accounts—conduct that is consistent with his lying to the SEC during the fraud scheme and its investigation, lying to the jury, and attempting to flout this Court's authority over him.  Finally, Defendant was an experienced, highly-educated securities lawyer who is expected to abide by professional standards of ethics and responsibility.  Defendant was a "gatekeeper" in the securities world, since the registration statements and other key documents that were crucial to the scheme could not have been executed or filed without the participation of an attorney.  As various witnesses testified and numerous documents established at trial, Defendant Schneider was a necessary and knowing participant from the beginning of the fraud scheme through its conclusion.  Defendant also was the only "gatekeeper," or professional who was actively involved during the entire duration of the fraud scheme.  For all of these reasons, the Court should reject the arguments of the defense as to the sentencing determination.

### A.   Schneider is Not Similarly Situated As a Matter of Law to Any Other Defendant Convicted in the Shell Factory Fraud Scheme Because All of the Other Defendants Pled Guilty and Cooperated in Connection with the Prosecution of Others

The Eleventh Circuit has consistently held that when a district court is applying the sentencing factors set forth in 18 U.S.C. § 3553(a), as a matter of law a defendant who proceeds to trial is not similarly situated to a defendant who signs a plea agreement and cooperates with the government:

> [F]or purposes of § 3553(a)(6), a defendant who cooperates with the Government and pleads guilty is not "similarly situated" to his co-defendant who proceeds to

4

trial. Thus, there is no unwarranted disparity even when a cooperating defendant receives a "substantially shorter" sentence than a defendant who goes to trial.

*United States v. Cavallo*, 790 F.3d 1202, 1237 (11th Cir. 2015), *citing United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009). Defendant makes much in his sentencing memorandum of a supposed sentencing disparity between the applicable guideline range in his case and the sentences that other defendants received. This argument is legally incorrect, because Defendant Schneider is not similarly situated under § 3553(a) to any other defendant charged in the overall scheme. *See Cavallo*, 790 F.3d at 1237. Defendant Schneider fails to address the fact that all of the other defendants were charged under different statutes, pled guilty and cooperated (having provided truthful information to the Government), and all of the other defendants received a motion for reduction of sentence from the government. There is thus no sentencing disparity between Defendant Schneider and any other defendant who signed a plea agreement and cooperated with the Government.

Furthermore, all of the other defendants publicly acknowledged their guilt and participation in a complex fraud scheme. The reality is that pleading guilty in a complex case like this allows the Court to know that the defendant's chances of recidivism are lower than they are if a guilty defendant maintains his innocence. Additionally, the limited resources of the Government can be used to prosecute other wrongdoers. Here, the cooperation and assistance of various defendants were invaluable for the Government to fully understand the evidence pertaining to Schneider that spanned twenty fraudulent companies and a vast array of individuals and events. Eight separate cooperators testified at the Schneider trial. Other cooperators were at the courthouse or on standby during the trial and were prepared to testify. Simply put, without the truthful participation of these cooperators, the Government likely would not have been able to understand and synthesize the

evidence sufficiently to allow for the successful prosecution of Schneider.  On the other hand, had Schneider decided to plead guilty, the Government likely would have been able to use its resources to charge additional wrongdoers involved in the scheme.

### B.   Defendant Lied Under Oath During His Trial Testimony, Further Distinguishing Him From the Other Eleven Defendants

As noted in the PSI and as set forth in the Government's Response to Defendant's Objections to the PSI, the Defendant lied in substantial ways during his trial testimony.  Defendant's lies were aimed at confusing and misleading the jury.  Many of the lies, such as his testimony concerning Premier Nursing/Premier Energy were patent, and they were contradicted by exhibits and the trial testimony of other witnesses.  Defendant's lies concerning his having "no reason at all" to know that Steven Sanders, Daniel McKelvey and Alvin Mirman controlled the companies was brazen, especially considering how precise his memory was at trial for details during the scheme that he considered to be helpful to him.  Defendant's lies during trial of this case were consistent with the lies he made during the fraud scheme on documents and in interactions with the SEC, and then later during the SEC's investigation of his conduct.  This factor distinguishes Defendant from the other persons prosecuted in related cases.

### C.  Defendant Lied During the Presentence Investigation and Attempted to Hide and Conceal his Assets, Funds and Accounts

The Defendant made false and misleading statements to the Probation Officer concerning his assets, accounts, and property.  As the Probation Officer specifically noted in the PSI, Defendant "denied having any securities, money owed to him by others, life insurance policies, or safe deposit boxes."  (*See* PSI ¶ 172).  To the contrary, the Government has begun to uncover a trove of assets and Defendant's intricate transfers of funds since the filing of the Indictment as apparently

calculated means to conceal his assets and evade paying restitution.

Some of these assets (and their concealment) were set forth in the Government's Notice Concerning Defendant's False Statements to the Probation Office, filed February 8, 2019 (Dkt. No. 155). Defendant did not disclose to the Probation Officer: (1) the TD Ameritrade IRA account in his name; (2) the other TD Ameritrade account (if there were two); (3) the source of the large amounts of cash that he used to pay his lawyers' fees that originated from an (undisclosed) account in the name of his wife only (after sending all of the Boca Raton house sale proceeds to a brokerage account in her name, but over which he had signature authority and power of attorney); (4) the $65,675 tax refund check for tax year 2015, when Defendant disclosed no employment since August 2016, and disclosed an annual salary of $200,000 to $260,000; (5) the source of the assets or funds used to purchase the $50,000 cashier's check at Wells Fargo, one week before trial, and that was then hand-deposited into the Citi joint checking account by Defendant; and, (6) the apparent life insurance policies and/or annuities in his name, or to which he is a beneficiary, that Schneider was funding as recently as August 2018 from the Citi joint checking account.[2]

The Government also recently learned after the amended PSI was released on February 6, 2019, that Defendant Schneider had numerous accounts at Morgan Stanley. Morgan Stanley account records show that Schneider and his wife held approximately **$2,450,000** in assets as of early 2018. Schneider held approximately $900,000 in an individual IRA account in his name, which he transferred to Scottrade in or around January 2018. Another account holding over **$1,300,000** was in Schneider's wife's name, but Schneider had signature authority over the account.

---

[2] The Government noted certain of these payments in its Notice, filed February 8, 2019 (Dkt. No. 155), but is still without sufficient information to determine the full extent or nature of these payments, accounts, and assets. This was based on checks and other account statements that were recently produced on February 6, 2019, by Citi.

The account records show that: (1) Schneider was his wife's attorney-in-fact for the account, (2) the proceeds from their jointly-owned residence were deposited there; and (3) substantial sums were withdrawn for Schneider himself and Schneider's criminal defense attorneys.  All or nearly all of the funds form the Morgan Stanley accounts were transferred out of Morgan Stanley to other financial institutions, including Scottrade and JP Morgan in or around January 2018.  None of the accounts at Morgan Stanley or the accounts at Scottrade or JP Morgan were disclosed to the Probation Officer.  Rather, Defendant disclosed to the Probation Officer only one joint checking account at Citi bank worth $3,000.

Based on this concealment by the Defendant, the Court does not have an accurate picture of his financial condition at all.  Defendant has attacked the Government's efforts to bring these issues to the attention of the Court, but has not otherwise addressed his concealment of accounts and assets.  This concealment and obstruction of the Probation Officer during the presentence investigation distinguishes Defendant Schneider from all of the other defendants charged in related cases.

### D.  Defendant's Extensive Role in the Fraud Scheme as the Only "Gatekeeper" Involved During the Entire Timespan Distinguishes Him From the Other Defendants

There were 20 fraudulently created companies that were part of the fraud scheme, 18 of which involved the fraudulent sale of falsely classified "free trading" shares that were sold for hundreds of thousands of dollars each with the direct and substantial participation of Defendant Schneider. Evidence at trial established that Defendant Schneider participated at numerous stages of the fraud scheme, including: (1) the incorporation of the company in the case of BLES and otherwise being involved at the creation stage or set up; (2) aiding with the fraudulent registration

8

of securities offerings with the SEC including by providing approximately 20 fraudulent opinion letters; (3) communications with SEC staff on behalf of the companies to make representations as to the legitimacy of the companies and answer questions from the SEC about the company's personnel or business purpose; (4) communications with staff of the Financial Industry Regulatory Authority (FINRA) on behalf of the companies without any involvement of the straw CEO, so that the conspirators could effectuate name changes and stock splits for shell buyers and thus facilitate the ability of buyers to engage in stock manipulations; (5) drafting false and fraudulent SEC filings, including Forms 8-K, regarding the name changes and stock splits as being legitimate corporate actions undertaken and authorized by the named CEO (versus by Sanders and McKelvey explicitly for the benefit of shell buyers); (6) numerous fraudulent opinion letters for the companies' shares containing false and fraudulent representations as to the unrestricted nature of the securities (including the "affiliate" status of the listed shareholders), without any communication with or confirmation from the straw CEO, so that the companies' shares could be falsely classified as "free trading" as the key component of the fraud; (7) participating in finding buyers for the companies and referring buyers to Sanders (but never to the companies' named CEO or officer); (8) acting as the closing attorney for the sale of the companies and all of the shares, to various buyers, in many instances responding to supposed "due diligence" or other inquiries purportedly on behalf of the selling company; (9) handling the actual sale of the companies (the purported free-trading and restricted shares), including the physical transfer of paperwork including corporate documents; and, (10) handling and distributing approximately $5.8 million in sales proceeds to the co-conspirators, not the named officer or listed owner of the shares supposedly entitled to receive the payments. All of the above-referenced actions involved lies and deceit on the part of Defendant.

Defendant's extensive and lengthy involvement, while acting as a "gatekeeper" distinguishes him from every other defendant charged in relation to the scheme.

### Conclusion

The PSI sets out an extensive picture of the Defendant and his participation in a massive and complex fraud scheme.  The Court listened to the evidence at trial, including the trial testimony and the description of exhibits pertaining to witness testimony.  The Government also admitted numerous exhibits at trial which were not discussed by specific witnesses.  All of this evidence established Defendant's participation in the scheme.  In the Government's response to the defense objections to the PSI, the Government summarized specific witness testimony and exhibits that support each of the contested factual allegations in the PSI.

Defendant's concealment of assets and accounts form the Court during the presentence investigation rebuts all of the arguments Defendant makes in his own sentencing memorandum as to the supposed "aberrational" behavior involved in his crimes of conviction.  This is who the Defendant is – a liar who, unlike his co-conspirators, continues to this day to try to avoid responsibility through more lies.  For all of these reasons a guideline sentence that takes into account the entire record in this case would be appropriate.

Dated: February 13, 2019

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

By:   /s/ Jerrob Duffy
      Assistant United States Attorney
      Court No. A5501106
      99 Northeast 4th Street

10

Miami, Florida 33132-2111
Tel: (305) 961- 9273
Fax: (305) 530- 6168
Jerrob.Duffy@usdoj.gov

/s/ Christopher B. Browne
Assistant United States Attorney
Florida Bar No. 91337
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961- 9419
Fax: (305) 530- 6168
Christopher.Browne@usdoj.gov

/s/ Jeffrey Cook
Special Assistant United States Attorney
Florida Bar No. 647578
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961- 9004
Fax: (305) 530- 6168
Jeffrey.Cook2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by filing via the same via the Court's CM/ECF filing system, on all counsel or parties of record on the Service List below.

*s/ Jerrob Duffy*
Assistant United States Attorney

## SERVICE LIST

Ira Lee Sorkin, Esq.
Maria E. Garcia, Esq.
Mintz & Gold LLP
600 Third Avenue
New York, NY 10016
Phone: (212) 696-4848
Fax: (212) 696-1231
E-mail: sorkin@mintzandgold.com

Armando Rosquete, Esq.
Bell Rosquete Reyes
Phone: (305) 570-1551
Fax: (305) 570-1599
999 Ponce de Leon Boulevard, Suite 1120 PH
Coral Gables, FL 33134
E-mail: arosquete@brresq.com

*Attorneys for Defendant James Schneider*